GERALD E. CONDUX *et al.*, Plaintiffs-Appellants, *v.* FRANK S. NELDON, Defendant-Appellee.

First District (3rd Division)   No. 78-1387

Opinion filed April 23, 1980.

Michael W. Rathsack, of Chicago (Stuart C. Wallace, of counsel), for appellants.

George J. Murtaugh, Jr., and Robert P. Nolan, both of Chicago, for appellee.

Mr. JUSTICE SIMON delivered the opinion of the court:

When is a sale of stock not a sale of securities? When it is the sale of a business.

The defendant owned all the stock of Blue Island Gun Shop, Inc., a retail business. For $186,000, he sold it all to the two plaintiffs, who took over the business and operated it for 2½ years. Dissatisfied with the results, they sued to rescind the sale, claiming it was a sale of unregistered securities, in violation of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1973, ch. 121½, pars. 137.1 through 137.19) (the Act). The circuit court dismissed the complaint for failure to state a cause of action. We affirm.

If such a sale were concluded today, it would be exempt from registration under section 4(O) of the Act (Ill. Rev. Stat. 1977, ch. 121½, par. 137.4(O)), because the plaintiffs, after the sale, owned 50 percent or more of the stock of the corporation. Because that provision was enacted after this sale, the defendant concedes it has no application to this case.

Previous opinions have ruled against similarly opportunistic plaintiffs by calling forth another exemption, section 4(G) (Ill. Rev. Stat. 1977, ch. 121½, par. 137.4(G)). That provision allows sale of unregistered securities to a few dozen people, provided certain information about the sale is filed within 30 days thereafter. It has been held that where a plaintiff was an officer or director at the time of the sale (*Stevens v. Crystal Lake Transportation Sales, Inc.* (1975), 30 Ill. App. 3d 745, 332 N.E.2d 727) or as a result of the sale (*James v. Erlinder Manufacturing Co.* (1979), 80 Ill. App. 3d 4, 398 N.E.2d 1225), the responsibility for filing on behalf of the corporation was as much his as the defendant's, and that the plaintiff should therefore not recover.

In this case, however, the corporation itself sold no stock and would not be liable if the sale violated the Act. Where the corporation has no duty to file, we do not see how its officers and directors can be held to any such duty derivatively. And the parties have not argued, or even mentioned, the 4(G) theory, here or below.

In any event, the 4(G) theory strikes us as an evasive technicality. We prefer to address the more fundamental issue, the only one the parties have presented. Is the sale of all the stock in a corporation to a single buyer or a small group of affiliated buyers a "sale of securities"? Is it the sort of sale the securities laws were intended to cover? We hold that it is usually not.

In commercial substance, the plaintiffs bought a gun shop. The sale was consummated in the form of a sale of stock, not assets; but that is only a matter of form. The plaintiffs insist that form is all-important, that the defendant agreed to the form and is stuck with all it entails. But "[i]n determining whether an instrument is a security within the meaning of the statute, the courts look to the substance of the transaction, to the relationship between the parties; these elements will control as against the form of the instrument. Form is disregarded for substance and emphasis is placed on the economic reality." *Polikoff v. Levy* (1965), 55 Ill. App. 2d 229, 234, 204 N.E.2d 807; accord, *Tcherepnin v. Knight* (1967), 389 U.S. 332, 336, 19 L. Ed. 2d 564, 569, 88 S. Ct. 548, 553.

There are good reasons for this rule. The plaintiffs cannot claim to have relied on a right of rescission when they first bought the stock, for had they known then that the sale was covered by the Act and that the shares were not registered, they would now be barred by the 6-month limitation rule of section 13(B) of the Act (Ill. Rev. Stat. 1973, ch. 121½, par. 137.13(B)). Any rights the plaintiffs now claim are for them a windfall. Conversely, it seems doubtful that the defendant anticipated or could have been induced to agree to the obligations the plaintiffs now seek to impose; for this defendant, the securities laws are a trap. The law does not favor windfalls or traps. The rescission provision of the Act is a penalty, designed to compel promoters to register their stock. But had the parties anticipated the present conflict, the seller could have insisted on structuring the transaction differently. This would probably have been possible. Applying the securities laws according to form will not, therefore, afford future buyers the protection of those laws, but will only drive sales into other, presumably less convenient, forms. The laws will function only as traps, or in those rare cases where the stock format, despite the burden imposed by the Act, is, fortuitously, still the least unattractive course.

Apart from our reluctance to promulgate a rule so easily evaded, *Polikoff v. Levy* and numerous other cases setting forth the same view show that there is no good reason for extending the protection of the Act to the present plaintiffs, since they fail what is generally known as the *Howey* test, or the passive investor test.

> "Both the Illinois and the federal courts have emphasized that a security within the meaning of the acts is a contract, transaction or

scheme whereby one person invests his money in a common enterprise on the theory that he expects to receive profits *solely from the efforts of others*. Sire Plan Portfolios, Inc. v. Carpentier, 8 Ill App 2d 354, 132 NE2d 78; S.E.C. v. Howey Co., 328 US 293; Hammer v. Sanders, 8 Ill 2d 414, 134 NE2d 509; S.E.C. v. Bailey, 41 F Supp 647. The reason for excluding from the scope of the securities laws those transactions in which the profits do not come solely from the efforts of others is clear. In such situations, the member of the enterprise pools his money with that of others in the group; he has an equal right of control over the project and the opportunity and right to know what is going on. Because of this, the protection of the full disclosure offered by registration is not needed *as it is in cases involving a nonparticipating investor.*" *Polikoff v. Levy* (1965), 55 Ill. App. 2d 229, 234, 204 N.E.2d 807, 809.

The rights the plaintiffs claim would be manifestly open to abuse. A buyer, once in control of the corporation, would find it to his advantage to gamble with it, to take abnormal risks, knowing that any profits will be his while any losses can be unloaded onto the seller. The buyer would have an incentive to manage his business imprudently; the helpless seller, who thought he was disposing of his business, would find himself indefinitely dependent on its fortunes, now at the mercy of a buyer of unknown skill and honesty, over whom the seller has no control. The seller, in fact, would be in the sort of position the securities laws attempt to protect buyers against.

To apply the securities laws to this case would be to try to cure an evil that does not even exist here, by means doomed to failure, at the expense of appalling injustice to the seller and probable damage to the economy at large. We do not believe this is what the legislature intended.

"Since 1919, the clearly indicated purpose of the Illinois securities laws has been 'to furnish information, to protect credulity and ignorance from deception * * * prevent fraudulent and deceitful sales of securities * * *' (*Stewart v. Brady* (1921), 300 Ill. 425, 439, 133 N.E. 310; see also *Martin v. Orvis Bros. & Co.* (1974), 25 Ill. App. 3d 238, 244, 323 N.E.2d 73), and 'to protect innocent persons who may be induced to invest their money in speculative enterprises over which they have no control.' *Meihsner v. Runyon* (1960), 23 Ill. App. 2d 446, 456, 163 N.E.2d 236.

* * *

'[T]he Securities Law serves a useful purpose and should be construed liberally in this light; however, it is intended to function as a shield for the innocent and not a sword for the investor who, because of the speculative nature of the venture or his own poor

business judgment, fails to reap the expected return on his investment.' *Burke v. Zipco Oil Co.* (1974), 19 Ill. App. 3d 909, 913, 312 N.E.2d 339." *James v. Erlinder Manufacturing Co.* (1979), 80 Ill. App. 3d 4, 9, 398 N.E.2d 1225, 1228.

The plaintiffs cannot rebut these arguments. Essentially, their position is that there is no room for interpretation, no place for considerations of justice or the policies behind the Act. We are, rather, to enforce the Act rigidly, either because it is so clear on its face that we can and must apply it literally, or because precedent requires this. The meaning of the Act, however, is not so obvious to us as to the plaintiffs; and the precedents are against them.

Section 2.1 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.2—1) provides:

> " 'Security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, investment fund share, face-amount certificate, voting-trust certificate, fractional undivided interest in oil, gas, or other mineral lease, right, or royalty, option, put, call, privilege, indemnity or any other right to purchase or sell a contract for the future delivery of any commodity offered or sold to the public and not on a registered contract market, or, in general, any interest or instrument commonly known as a security, or any certificate of deposit for, certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

The plaintiffs argue that the statutory words " 'Security' means any * * * stock * * *" mean that *every* stock is a security, and, more importantly, that the sale of any stock is a sale of securities within the Act. Their view is that the *Howey* passive investor test, described above in the *Polikoff* quotation, and applied in many other cases, works in one direction only: the test serves to *include* investments in the definition of security, but cannot *exclude* any instrument expressly named in the definitional laundry list.

The plaintiffs do not spell out the logic of this position in any detail, perhaps because the attempt to do so would reveal its weakness. The plaintiffs' difficulty is to reconcile their interpretation of the statute with the existence of the *Howey* test. That test does not appear in the statutory language, but it undeniably exists; the plaintiffs must explain why it should apply to certain elements on the list, but not to stocks, and why it should operate in such a one-sided way.

The only plausible argument we can think of is as follows: The Act,

the plaintiffs might say, is intended to be as inclusive as possible. The definition is therefore to be interpreted as containing a long list of particular kinds of instruments and interests which are always to be treated as securities, plus catchall provisions for anything else that ought to be treated similarly. Unfortunately, the statute does not contain any express general catchall; but there are two candidates for the job. One is the provision reading "in general, any interest or instrument *commonly known as* a security"; the other is the phrase "investment contract," which, while it looks like just another element in the middle of the list, functions in the real world as a catchall. The function of the *Howey* test, plaintiffs explain, is simply to define one or both of these catchall categories; its prominence comes from the fact that disputes naturally arise most often where the statute is least definite.

This approach is a far cry from the plaintiffs' professed argument that we can decide in their favor by applying the statute literally, without considering its purposes or attempting to make sense of it.

There is substantial authority for the proposition that the passivity test is the definition of "investment contract," or of what is "commonly known as a security," rather than of "security" in general. From this, however, it does not follow that the test is entirely irrelevant to any other kind of security; and several cases suggest that it is not. *Polikoff* and *Meihsner* discuss the test as a test of whether an investment is a "security" directly, without mention of investment contracts or other particular categories. *United Housing Foundation, Inc. v. Forman* (1975), 421 U.S. 837, 44 L. Ed. 2d 621, 95 S. Ct. 2051, says that the passivity test "in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security." (421 U.S. 837, 852, 44 L. Ed. 2d 621, 632, 95 S. Ct. 2051, 2060.) C.J.S., in fact, considers it "a well established principle that the securities acts are not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture * * *." 79 C.J.S. Securities Regulation Supplement §201 (1974).

*Forman* held that certain instruments labeled "stocks" were not securities. Since they had none of the normal attributes of stock, the decision is not directly on point; but the court's language is enlightening:

> "In providing this definition Congress * * * sought to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' H. R. Rep.No. 85, 73d Cong., 1st Sess., 11 (1933). * * *.
> 
> " * * * [T]he shares purchased by respondents do not represent any of the 'countless and variable schemes devised by those who

seek the use of the money of others on the promise of profits,' *Howey*, 328 U.S., at 299, 99 L. Ed. 2d 1244, 66 S. Ct. 1100, 163 A.L.R. 1043, and therefore do not fall within 'the ordinary concept of a security.'

\* \* \*

\* \* \*. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes. \* \* \*. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction \* \* \*. Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction:

> '[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' [Citations.]

Respondents' reliance on *Joiner* as support for a 'literal approach' to defining a security is misplaced. \* \* \* In dictum the [*Joiner*] Court noted that '[i]nstruments *may* be included within [the definition of a security], as [a] matter of law, if on their face they answer to the name or description.' [Citation.] And later, again in dictum, the Court stated that a security *'might'* be shown 'by proving the document itself, which on its face would be a note, a bond, or a share of stock.' [Citation.] By using the conditional words 'may' and 'might' in these dicta the Court made clear that it was not establishing an inflexible rule barring inquiry into the economic realities underlying a transaction. On the contrary, the Court intended only to make the rather obvious point that, in contrast to the instrument before it which was not included within the explicit statutory terms, most instruments bearing those traditional titles are likely to be covered by the statutes." *United Housing Foundation, Inc. v. Forman* (1975), 421 U.S. 837, 847-50, 44 L. Ed. 2d 621, 629-31, 95 S. Ct. 2051, 2058-59.

And in *Tcherepnin v. Knight* (1967), 389 U.S. 332, 19 L. Ed. 2d 564, 88 S. Ct. 548, the court, after saying that the investment could be viewed as stock, as "certificates of interest in any profit-sharing agreement," and as "transferable shares," went on to discuss the legislative history of the Act as it related to the particular kind of investment at issue, and said that "[p]olicy considerations lead us to conclude that these petitioners are entitled to the investor protections afforded by the [Act]. \* \* \*

> 'The investors in City Savings were less able to protect themselves than the purchasers of orange groves in *Howey*. These [petitioners] had to rely completely on City Savings' management

to choose suitable properties on which to make mortgage loans. * * * Because savings and loan associations are constantly seeking investors through advertising * * * the SEC's present tender of its expert services should be especially beneficial to would-be savings and loan investors as a shield against unscrupulous or unqualified promoters.'"
(389 U.S. 332, 345-46, 19 L. Ed. 2d 564, 574, 88 S. Ct. 548, 558.) The court would not have considered such things if the plaintiffs were correct that stock is stock and nothing else matters.

These cases interpret Federal law, but they are persuasive authority because the definitions in the two statutes are so similar. Indeed, almost all definitions in the Illinois Securities Act of 1953 were based on similar provisions of the Federal Securities Act of 1933. *Norville v. Alton Bigtop Restaurants, Inc.* (1974), 22 Ill. App. 3d 273, 278-79, 317 N.E.2d 384.

*McPherson v. Hewitt* (1975), 32 Ill. App. 3d 435, 335 N.E.2d 606, follows the same pattern. The instrument in question purported to be, and clearly was, a "common stock subscription agreement." It was a "certificate of interest or participation in, temporary or interim certificate for, * * * guarantee of, or warrant or right to subscribe to or purchase" stock (Ill. Rev. Stat. 1973, ch. 121½, par. 137.2—1); even more simply, it was an attempt, offer or contract to sell stock, and therefore itself a "sale" of stock under section 2.5 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.2—5). The court nevertheless analyzed the agreement as an "investment contract."

In *Silver Hills Country Club v. Sobieski* (1961), 55 Cal. 2d 811, 814, 361 P.2d 906, 908, 13 Cal. Rptr. 186, 188, Mr. Justice Traynor wrote:

> "[The interest sold] qualifies as a beneficial interest in title to property within the literal language of subsection (a) of section 25008. [Citations.] The crucial question nevertheless remains whether the sale of such a membership comes within the regulatory purpose of the corporate securities act."

In *Hathaway v. Porter Royalty Pool* (1941), 296 Mich. 90, 110-12, 295 N.W. 571, 579-80, the Michigan Supreme Court, interpreting a statute defining "security" much as ours does, held squarely that the issuance of stock was not necessarily a sale of securities:

> "If [the transaction would not otherwise involve securities] then it can be said with equal force that the issuance of stock certificates * * * using the medium of a corporate form for convenience in effecting the joint adventure, is not the issuance of 'securities' as contemplated by the statute. There is no more reason to hold the one issuance subject to the act than the other.
>
> * * *
>
> It is our conclusion that the agreement in question was an

agreement for a joint adventure; that the formation of the corporation pursuant to the agreement in no way changed the relationship of joint adventure between the parties; that the agreement for the use of the corporate medium was only a convenient method of carrying into effect the joint adventure, and was not a contract within the prohibition of the blue sky law; that the issuance of stock by the corporation to the pool members was not the sale of securities within the intendment of the statute."

Accord, *State v. Silberberg* (1956), 166 Ohio St. 101, 139 N.E.2d 342. But *cf. Jackson v. Robertson* (1962), 90 Ariz. 405, 368 P.2d 645 (though blue sky law not enacted to protect any of parties to suit, original issue of stock within Act to guard against possible future resale to public).

At least one Illinois case follows, though not very explicitly, the rule that substance is more important than form, whether the effect is to include or exclude from the operation of the blue sky law. In *Brothers v. McMahon* (1953), 351 Ill. App. 321, 115 N.E.2d 116, the plaintiff bought a unit in a cooperative apartment building to be constructed. To ensure that the entire building would be managed on a cooperative basis, he agreed to execute an agreement with other purchasers that title would be held by a corporation and he would receive stock for his proportionate share plus a long-term lease covering the apartment he was to occupy. The court held that this transaction was not a sale of securities. The corporation was described as a "merely mechanical incident[] to the basic contract * * * for the sale of * * * real estate." (*Brothers*, at 326.) "Plaintiff was buying a unit in a building * * * to be erected * * *. * * *. The medium of a * * * corporation was used for the convenience and protection of the parties who were to purchase an interest in the building. It is the common and usual method of handling such a transaction * * *." *Brothers*, at 328-329. See also *Hammer v. Sanders* (1956), 8 Ill. 2d 414, 134 N.E.2d 509 (interest in oil lease on face seemed security, but not so, because nonsecurity aspects uppermost in minds of parties).

The plaintiffs point to only one case in support of their position. In *Brown v. Gitlin* (1972), 4 Ill. App. 3d 1040, 283 N.E.2d 115 (Brown I), plaintiff and defendant each owned half the stock of a corporation; defendant sold his shares to plaintiff, who later sued to rescind; the circuit court gave summary judgment for the defendant; and this court reversed and remanded. The facts of that case seem very strong for the plaintiffs in this case. But the point here at issue was simply not considered; the opinion carefully explains that "[t]he *only* issue raised by the parties is whether or not defendant * * * is a 'controlling person' within the meaning of [section 4G]." (Emphasis added.) (*Brown I*, at 1041.) We do not, therefore, regard *Brown I* as authority for the proposition that such a sale is a sale of securities.

*Brown v. Gitlin* (1974), 19 Ill. App. 3d 1018, 313 N.E.2d 180, (*Brown II*), may suggest a broader reading of *Brown I*. But that suggestion, tenuous at best, is pure dictum. *Brown II* dealt with Gitlin's third-party malpractice claim against the lawyer who got him into his troubles. The case affirms a finding that overlooking the blue sky laws was *not* malpractice, because "'the average reasonably competent lawyer would not have recognized securities applications here * * *.'" *Brown II*, at 1021.

We conclude that the one-sided literal rule that the plaintiffs propound is neither obvious from the language of the Act nor supported by the authorities.

The plaintiffs misapprehend the import of the statutory definition of "security." The purpose and meaning of that definition are that every imaginable kind of security is covered—in other words, precisely that form does not count. The legislature has provided a list of every type of security it could think of, not to indicate that type is important, that it matters whether an interest falls within a specifically listed category, but rather to demonstrate the breadth of the concept of security. The drafters were concerned to leave no loopholes. Every old or new creation of the promoter's art was to be regulated. It is unnecessary, to give ample meaning to the definition, to assume that it mandates that every stock is a security; and that interpretation would run counter to the general tenor of the meaning. Clearer language has succumbed to the rule that statutes are to be read according to their purpose. *People v. Beam* (1979), 74 Ill. 2d 240, 384 N.E.2d 1315 (provision ignored as oversight); *Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 21, 373 N.E.2d 1332 ("shall" can be construed as "may," depending on legislative intent); *cf. Standard Oil Co. v. United States* (1910), 221 U.S. 1, 55 L. Ed. 619, 31 S. Ct. 502 ("every contract, combination * * * or conspiracy, in restraint of trade" means only unreasonable ones).

■■ The Securities Law is remedial legislation, and is therefore to be interpreted broadly to achieve its goals. But this maxim simply means that courts should accept and follow the law's spirit instead of limiting it to its letter as in derogation of the common law. (See *Securities & Exchange Com. v. Joiner* (1943), 320 U.S. 344, 88 L. Ed. 88, 64 S. Ct. 120.) It does not follow that *every* question is to be decided in favor of inclusiveness. With perhaps some bias toward inclusiveness, we think the law should be interpreted either inclusively or narrowly according to its purpose.

■■ The Securities Law is powerful medicine, with a substantial capacity to do harm, and is to be applied only where indicated, never wantonly. It was not the legislature's purpose to burden commerce, terrorize honest businessmen, and assure full employment for securities lawyers; and the Act should not be over-extended to achieve only *these* ends.

■ For all the above reasons, we reject the plaintiffs' contention that every stock is a security. The courts must continue to determine case by case whether the instrument alleged to be a security is in fact of such a character as fairly to fall within the scope of the statute. With due regard for general legal principles such as the desirability of protecting the parties' justifiable expectations, the crucial question is whether the transaction is within the regulatory purpose of the law.

We will consider the facts and circumstances surrounding the execution of the instrument to determine the true intent of the parties, their common purposes and expectations. We look to the substance of the transaction, to the relationship between the parties. Emphasis is on economic reality. We will exercise our commercial common sense, so that, in general, the character a transaction is given at law may accord with that which it has in commerce.

For novel or miscellaneous schemes, alleged to be "investment contracts," the *Howey* test will be virtually conclusive. There is no reason to regard such a transaction as a security except that it has the general economic character of one; and this is what the *Howey* test describes. When, on the contrary, a transaction takes the form of a standard type of security, that form may lead the commercial world, or the parties in particular, to regard the transaction as a sale of securities. Instruments of certain traditional types are very likely to be securities, and this fact should not be overlooked. But the *Howey* test should still be accorded substantial weight.

■ Applying these principles, we hold that the sale of stock to a buyer or small group of affiliated buyers who are to share in the control and management of the corporation, whether personally or through a nominee independent of the seller, is not a sale of securities. Such a transaction is no more than the outright sale of the business, as here, or, if the seller retains a part interest, the creation of a partnership in corporate form. In such a transaction the corporation and the stock are incidental. Most businessmen, and many lawyers, would look upon it so, and would never guess that the securities laws might apply. Such a buyer has no need for the protection of the blue sky laws, any more than the buyer of a sole proprietorship. The laws, we reiterate, are a shield between the promoter and the sucker, not a sword with which the merely unskillful or unlucky businessman may oppress his predecessors.

The defendant has done no wrong, and the plaintiffs are entitled to no relief.

Judgment affirmed.

McGILLICUDDY, P. J., and O'CONNOR, J., concur.