AL KAISER *et al.*, Plaintiffs and Counterdefendants-Appellees, *v.*
CHARLES W. OLSON III *et al.*, Defendants and Counterplaintiffs-Appellants.

First District (4th Division)    No. 80-1939

Opinion filed December 10, 1981.—Modified on denial of rehearing May 20, 1982.

Larry D. Blust, of Jenner & Block, and Mitchell S. Rieger and Reuben A. Bernick, both of Schiff, Hardin & Waite, both of Chicago, for appellants.

Abramson & Fox, of Chicago (James Fox and David Kozak, of counsel), for appellees.

JUSTICE JIGANTI delivered the opinion of the court:
The plaintiffs, Al Kaiser, Fred Kaiser and Harvey Kaiser (Sellers) filed an action in the circuit court of Cook County to recover the unpaid balance on a promissory note. The defendants, Gerald A. Finkle and

Charles W. Olson III (Buyers), had given the note to the Sellers in partial payment for 494,444 shares of stock of Kaiser Diversified Enterprises, Inc. (KDE), pursuant to a written purchase agreement. The Buyers denied liability on the note and counterclaimed for rescission. The Buyers sought to rescind the purchase agreement and recover the amount of the purchase price paid on the grounds that the Sellers had sold the stock in question to the Buyers without registering it or perfecting an exemption from registration in violation of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.1 *et seq.*) and that the Sellers had induced the Buyers to enter into the purchase agreement by untrue statements and by failure to disclose material facts in further violation of the 1973 Illinois Securities Law of 1953 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.1 *et seq.*). Alternatively, the Buyers sought damages on a theory of common law fraud.

The Sellers moved for summary judgment on the complaint and on all counts of the Buyers' counterclaim. The Buyers resisted the Sellers' motions on the complaint and on the counterclaim and filed a cross motion for summary judgment on their counterclaim. The circuit court granted the Sellers' summary judgment on their complaint on the note and entered judgment in the amount of $48,783.77 on the note. The court also denied the Buyers' motion for summary judgment on their counterclaims and entered judgment in favor of the Sellers and against the Buyers on the Buyers' counterclaims both under the securities laws and under the theory of common law fraud. The court also awarded the Sellers' attorney fees of $25,056.50, including fees for time spent defending against the Buyers' counterclaim.

A chronology of relevant events in this case begins in 1972 when the Sellers signed a finance agreement with Associates Credit Corporation of South Bend (Associates). Pursuant to this agreement, Associates financed KDE's inventory, land, building and other items. As KDE's major creditor, Associates was in a position to participate in major policy decisions involving KDE management from 1973 to 1979, the dates inclusive in this case.

In May 1973, the Sellers entered into a purchase agreement with an initial group of buyers (not the defendants) for the sale of approximately two-thirds of the stock which the Sellers owned in KDE. The Sellers took their remaining one-third shares of stock and exchanged them with KDE for the purchase of a KDE subsidiary. These two transactions not only divested the Sellers of all their KDE stock ownership, but the Sellers at the same time resigned as officers and directors of KDE and moved their offices and the subsidiary which they had purchased to a new location some distance removed from the premises of KDE.

Then, in July 1974, after the initial group of buyers defaulted on their

payments to the Sellers, a second group of Buyers (defendants here) was formed to substitute for the first group. Although one of the new Buyers was also a member of the first group, an Irving Zitowsky, the new transaction was structured as a substitute sale. The second group of Buyers (defendants Olson and Finkle along with Zitowsky, an undisclosed one-third participant) signed a new purchase agreement with the Sellers for the purchase of the 494,444 shares of KDE stock.

By the terms of the substitute purchase agreement, the total purchase price of the KDE stock was $100,000. The Buyers gave the Sellers a down payment of $35,000 and signed a promissory note for the balance which was to be paid over the next three years. Under this purchase agreement, the Sellers disclaimed any warranties to the Buyers. The Buyers, however, warranted to the Sellers that they were completely familiar with the financial conditions and operations of KDE and acknowledged that they were accepting stock which was unregistered under Federal securities laws. The purchase agreement contained no mention of Illinois securities laws.

The promissory note that the Buyers gave the Sellers provided that the Buyers would pay "all costs of collection, legal expenses and attorneys' fees" incurred or paid by the Sellers in collecting the note.

At the time of the July 1974 sale, Finkle was a full-time consultant to KDE and was deeply involved in the management of the corporation. Finkle's full time office was located at KDE. Although the record is not entirely clear on this point, Finkle had apparently been identified by Associates as the appropriate person to oversee KDE operations and help insure the value of Associates' security interest in KDE. Finkle became president of KDE nine months after the July 1974 purchase agreement was signed.

Olson decided to invest in KDE in the spring of 1974 when he was approached by Zitowsky and Donald J. Brumlik. (Brumlik was Olson's attorney and also served as counsel to KDE.) Zitowsky and Brumlik encouraged Olson to join with Finkle and Zitowsky in the purchase of KDE stock. Olson agreed to join with Finkle and Zitowsky in buying the stock, but made it clear that he did not wish to actively involve himself in KDE.

Zitowsky at the time of the transaction had his office at KDE and served as its sales manager. Zitowsky declined to be named as a principal in the purchase agreement and designated Finkle and Olson as his nominees in this transaction. Unlike the Buyers' side of the 1974 purchase agreement, which included Finkle and Zitowsky as active participants in KDE, the Sellers never reinvolved themselves in KDE after initially selling out in 1973.

Simultaneously with signing the purchase agreement, the Buyers signed a voting trust agreement and placed their newly acquired stock in the hands of a trustee. This voting trust remained in effect until July 1977, when it was dissolved as part of the Buyers' attempt to tender the stock back to the Sellers and recover that part of the purchase price already paid.

The remaining relevant facts involve the setbacks suffered by KDE and the Buyers after the purchase agreement took effect. On July 10, 1974, S. D. Leidesdorf & Co., an independent auditor, completed KDE's 1973 audit and submitted a copy of this report to Finkle. The report indicated that there were serious errors in the 1972 audit which had been prepared by the firm of Borenstein, Louis, and Price, also an independent auditor. Through the Leidesdorf report, Finkle learned that KDE's inventory and accounts receivables had been overstated for 1972. In September 1974, Finkle also learned of the existence of an IRS tax lien on KDE which dated back to 1968. Olson also learned of these problems sometime between July and December of 1974.

After learning of the audit and tax problems and after conferring with counsel, the Buyers decided to continue making installment payments to the Sellers. The Buyers issued no notice of protest to the Sellers upon learning of these problems in 1974 and continued making installment payments through 1975. In July 1976, the Sellers' attorney sent a collection note to the Buyers concerning late payments on the promissory note. In August 1976, Olson responded to the collection note by sending the Sellers one-third of the amount due on the installment. The remaining two-thirds was not paid. Finally, in December 1976, the Sellers filed their complaint. Shortly after this complaint was filed, the Buyers' attorney dispatched a letter to the Illinois Secretary of State requesting information as to whether or not the KDE stock which the Buyers had bought was registered. On January 17, 1977, the Secretary of State issued his certificate certifying that the KDE stock was unregistered. The same month, the Buyers notified the Sellers that they intended to void the sale and tender the KDE stock back to the Sellers pursuant to the procedure outlined under the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.13). The Buyers then filed their answer and counterclaim.

In July 1977, the Buyers dissolved the voting trust. Finally, on September 27, 1977, Associates foreclosed its security interest in KDE because the corporation was in serious financial trouble. Then KDE was involuntarily dissolved.

The Sellers contend that the Buyers did not give timely notice of their intent to rescind under the Act, that the Buyers did not make a proper tender under the Act and also that this was the sale of a business and

therefore was not the sale of a security under the securities act. We find the last of the Sellers' contentions dispositive and will not consider the other matters raised.

*Condux v. Neldon* (1980), 83 Ill. App. 3d 575, 404 N.E.2d 523, is cited by both parties on the issue of whether or not the sale of the KDE stock was a sale of securities under the Illinois act.

In *Condux*, the court examined the purpose of the Illinois securities laws and explored the scope of these laws as they apply to sales of unregistered securities. The purpose of the laws according to the *Condux* court is as follows:

> " 'Since 1919, the clearly indicated purpose of the Illinois securities laws has been "to furnish information, to protect credulity and ignorance from deception * * * prevent fraudulent and deceitful sales of securities * * *" [citations], and "to protect innocent persons who may be induced to invest their money in speculative enterprises over which they have no *control*." [Citation.] * * *' " (Emphasis added.) 83 Ill. App. 3d 575, 578, 404 N.E.2d 523, 526.

*Condux* involved a sale of all the stock of a gun shop. The sale of the stock passed control of the business from the defendants to the plaintiffs. The plaintiffs assumed control of the business and operated it for two and one-half years. Dissatisfied with the results, they sued to rescind the sale, claiming it was a sale of unregistered securities in violation of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.1 *et seq*). In *Condux* the court rejected the buyers' attempt to use the securities laws to rescind the sale and held that the sale of stock to a small group of affiliated buyers who are to share in the control and management of the corporation, whether personally or through a nominee independent of the seller, is not a sale of securities within the Illinois Securities Law, but is no more than an outright sale of the business. 83 Ill. App. 3d 575, 585, 404 N.E.2d 523, 531.

The Buyers give two reasons why *Condux* is not dispositive of this case and why a reviewing court should not decide that the transaction here involved was the sale of control of a business. The Buyers' first reason is that the type of control referred to in *Condux* only exists when 100% of the stock in a company is purchased, when the purchasers have "ultimate authority" for management, and when a determination of whether such control exists has been decided as a question of fact and not as a question of law by a summary judgment. The second reason given by the Buyers as to why *Condux* is not dispositive of this case is that the issue of control was not properly raised in the court below and cannot be raised for the first time on appeal.

■■ We believe that *Condux* is not limited exclusively to buyers of 100%

of the stock of a company and that this is a matter properly decided on a summary judgment. Although the sale of the business in *Condux* involved the sale of 100% of the stock in a gun shop, the court held that the basic determination as to whether the transaction involved the sale of stock or constituted the sale of a business must be made on a case-by-case basis. The court said that the substance of the transaction and the relationship between the parties should be paramount with emphasis on the economic reality of the transaction. The realities of the situation under the instant facts are that the Buyers paid the Sellers $100,000 and in return obtained stock which represented more than half of the entire stock of the corporation. The Buyers were also actively involved in the management of the corporation both before and after the transaction with the Sellers. Thus, the conditions of management and control which are set out in *Condux* are met here. The record is sufficiently clear on the subject so as to make it properly determinable on the summary judgment.

We also disagree with the Buyers' contention that the issue of control as set out in *Condux* was not properly addressed in the trial court. Since *Condux* had not yet been decided at the time of this case, it could not have been argued in the court below. Furthermore, the underlying issue of *Condux* is control and the record is abundantly clear on the issue of control.

■■ Olson argues in his reply brief that the court should treat him differently than it treats Finkle in deciding this case. Olson claims that unlike Finkle, who participated in KDE's management, he was only a "passive investor" and thus deserves the full protection afforded passive investors under the securities law.

The "passive investor test" to which Olson refers is set forth in *Polikoff v. Levy* (1965), 55 Ill. App. 2d 229, 204 N.E.2d 807, *cert. denied* (1965), 382 U.S. 903, 15 L. Ed. 2d 156, 86 S. Ct. 237, and speaks to the question of who is to be protected under the Illinois Securities Law. In *Polikoff* the court set forth the test as an investor who expects to receive profits "solely from the efforts of others." More specifically the court stated:

> "Both the Illinois and federal courts have emphasized that a security within the meaning of the acts is a contract, transaction or scheme whereby one person invests his money in a common enterprise on the theory that he expects to receive profits *solely from the efforts of others*." 55 Ill. App. 2d 229, 234, 204 N.E.2d 807, 809.

We have already decided that Olson was part of a small group of affiliated buyers who purchased legal control of the business. Thus, his purchase was outside the scope of the Illinois Securities Law. Under the facts of this case, we also believe that Olson does not qualify for any

special protection under the "passive investor test." Olson participated in purchasing control of the business but chose not to participate in the active management of the business. Finkle and Zitkowsky initially asked Olson if he would like to be on the board of directors of KDE and Olson declined. We do not believe that the Illinois Securities Law is designed to protect as "passive investors" those who are in a position to elect whether they will be "active" or "passive" investors.

In addition, Olson was relying by choice on the efforts of "others" to receive his profits. However, the "others" whose efforts he was relying upon were his own affiliates in the voting trust, Finkle and Zitowsky and not the Sellers. These were the same "others" who had initially promoted KDE stock to Olson and induced him to buy the shares. Therefore, because Olson elected to be a "passive investor" and because the "others" he was relying upon for his profits were his own compatriots, we do not agree that Olson qualifies as a "passive investor."

Having once decided that the Illinois Securities Law does not apply in this case, the Buyers' arguments relating to their efforts to rescind the purchase agreement through timely notice and retender of the stock certificates to the Sellers become irrelevant.

■ Furthermore, the Sellers claim that the trial court properly granted their summary judgment motion on the issue of common law fraud because the Buyers waived any alleged misrepresentations. The Buyers, however, contend that the doctrine of waiver only applies to an action for rescission and that it is impossible to waive a cause of action for fraud as long as an injured party elects to affirm the contract and sue for damages within the statute of limitations. We do not agree with this contention.

The doctrine of waiver has worked its way over into actions at law. (D. Dobbs, Remedies, sec. 2.3, at 44 (1973); see "Waiver," Black's Law Dictionary 1417 (5th ed. 1979).) It is a well-established principle that a person defrauded in a transaction may, by conduct inconsistent with an intention to sue for damages for fraud, waive the right to sue. (37 C.J.S. *Fraud* secs. 69, 72 (1943); 37 Am. Jur. 2d *Fraud and Deceit* §386 (1968); Annot.) Specifically, waiver will apply if a party, after discovering the alleged fraud and with full knowledge of its material aspects, engages in conduct which is inconsistent with an intention to sue. This is particularly true when the conduct engaged in affords the defrauded party an advantage or misleads or prejudices the opposite party. (*Harris v. Egger* (6th Cir. 1915), 141 C.C.A. 219, 226 F. 389; cited in Annot., 52 A.L.R. 1153, 1156 (1928).) One is not permitted to lie back and speculate as to whether avoidance or affirmance of a contract will ultimately prove more profitable. Restatement (Second) of Contracts sec. 381, Comment *a* (1981).

Under Illinois law, nine months of silence and unreasonable delay on the part of a party has been held to be grounds for waiver of damages for

fraudulent misrepresentation. (*Bulley & Andrews, Inc. v. Symons Corp.* (1975), 25 Ill. App. 3d 696.) However, in the instant cause, the record clearly shows silence and unreasonable delay on the part of the Buyers of almost three years after the discovery of the alleged fraud. Moreover, the record shows other conduct on the part of the Buyers which is inconsistent with an intention to seek damages for fraudulent misrepresentation. The Buyers discovered the alleged fraud within months after signing the purchase agreement, while their performance was still largely executory. The Buyers conferred with counsel and still continued to make installment payments. When the Sellers' attorney sent a collection note two years after the contract was signed, Olson responded by sending part payment on the installment. The Buyers ran the company until it was finally dissolved in 1977. The Buyers did not bring an action for damages for fraudulent misrepresentation until the Sellers sued them for the purchase price and they then counterclaimed.

The Buyers' conduct here closely parallels the conduct of the defendants in *Nathan v. McKernan* (1960), 170 Neb. 1, 101 N.W. 2d 756, cited in 37 Am. Jur. 2d *Fraud & Deceit* sec. 386 n.18 (1968). There the defendants purchased a business from the plaintiffs, took possession of the business, immediately discovered the alleged fraud, remained silent about the discovery for four years, ran the business until it finally folded, and then counterclaimed for damages for fraudulent misrepresentation when the sellers sued for payment. In *Nathan*, the court held as a matter of law that a suit for damages for fraudulent misrepresentation can be lost through waiver when a party with full knowledge of the fraud and all the material facts related to it engages in conduct inconsistent with the maintenance of such an action. We believe that this is the correct result.

We do not think that the cases cited to us by the Buyers, which involve the right of a defrauded party to affirm a contract and sue for damages, deal directly with the issue of waiver. These cases do not concern inconsistent conduct on the part of defrauded plaintiffs or prejudice to the opposing parties which would waive a cause of action for fraud. The Buyers cite *Allen v. Henn* (1902), 197 Ill. 486, 64 N.E. 250, where the court held that it was entirely appropriate for buyers to delay in their cause of action for fraud until the sellers instituted a suit for mortgage foreclosure. We have held such delay is inappropriate under the instant facts because it equates with conduct inconsistent to pursuing an action for fraud. Also, in *Henn*, the buyers did not engage in speculation which caused a diminution of the value of the property in their hands which would prejudice the sellers. In the instant cause, the Buyers controlled and managed the business until it became insolvent.

The Buyers also rely on *Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 408 N.E.2d 782. In *Pearson* the issue of waiver was not

before the court because it had not been pleaded in the answer and the court would not allow an amendment to the answer. This is not the situation here. Furthermore, buyers in *Pearson* filed their action within a short time after the defendant had promised to complete performance after allowing a reasonable delay for the completion of the work which the sellers promised to perform. The buyers in *Pearson* did not engage in conduct inconsistent with an action for fraud. Therefore, since the courts in these cited cases did not consider issues of inconsistent conduct or prejudice, we do not consider them controlling here.

■■ Finally, the Buyers allege that the court erred in the amount of the award of the Sellers' attorney fees because the award included the costs of defending against the Buyers' counterclaim. A resolution of this issue depends upon the meaning of the words "all costs of collection, legal expenses and attorneys' fees" incurred by the Sellers "in collecting this note" which appear in the promissory note. The parties agree that the meaning of these words are matters of law to be decided by the court. The function of the court in such situations is to construe the contract and determine its legal effect. (See 17 C.J.S. *Contracts* §16, at 1248 (1963).) More specifically, a court must seek to ascertain the intentions of the parties and this intention, once found, will be given effect if it is consistent with the language used, with the law and with public policy. 4 Williston, Contracts sec. 600, at 281 (3d ed. 1961).

We believe that the proper legal construction of the language used is that attorney fees are not appropriate on the Buyers' claim for rescission. In our judgment, the intention of the parties when they employed the language "all costs of collection * * * in collecting this note" meant the ordinary costs of collection which would be incurred merely by the nonpayment of the note. Our interpretation of the intention of the parties in this contract is consistent with the standard for interpretation of integrated bilateral contracts which is set out in Williston. (4 Williston, Contracts sec. 603, at 342 (3d ed. 1961).) The standard to be applied is that of "reasonable expectations"; that meaning that a reasonably intelligent person acquainted with the operative usages of the words and knowing all the circumstances would give them. (4 Williston, Contracts sec. 603, at 342, 344 (3d ed. 1961).) We do not believe that the parties reasonably expected that the costs of collection on the note would include a suit whereby the purchasers would seek to obviate the entire transaction.

Our construction of this language appears consistent with existing case law. The same language, "all costs of collection" was interpreted by the court in *Jackson v. Oppenheim* (2d Cir. 1976), 533 F.2d 826, as not including attorney fees for a defense of all actions "incidental" to the integrity of the note. The "incidental" action in *Jackson* was the defense of

a separate claim regarding the validity of the underlying sale transaction under Federal securities laws. The rationale for the court's finding in *Jackson* was that some language more express than "costs of collection" should have been employed to have placed the party charged on notice that he was undertaking to protect the obligee from costs incurred in defending against a separate claim and not just the ordinary collection expenses in recovering upon a defaulted promissory note. 533 F.2d 826, 831.

Therefore, we hold that it was error for the trial court to award Sellers' attorney fees for defending against the counterclaim and limit the award of attorney fees to the Sellers' expenses in collecting upon the defaulted promissory note.

For the above and foregoing reasons, the judgment of the circuit court is affirmed in part, reversed in part and remanded in part.

JOHNSON, P. J., and ROMITI, J., concur.