MICHAEL E. RONNETT, Plaintiff-Appellant, *v.* AMERICAN BREEDING HERDS, INC., *et al.,* Defendants-Appellees.

First District (2nd Division)   Nos. 82—2485, 82—2726, 82—2851 cons.

Opinion filed June 5, 1984.

Keith J. Kulie and Frank R. Wiemerslage, both of Chicago, for appellant.

Ronald M. Brown and David M. Heisler, both of Brown & Shinitzky, Chartered, of Chicago, for appellees American Breeding Herds, Inc., Irwin Fischman, and Tobin C. Carlin.

Stuart M. Widman, of Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., of Chicago, for appellees John M. Shannon & Associates, Inc., and Bernard A. Levin.

Stuart D. Perlman and Emil Shafran, both of Chicago, for appellees Investorplan, Inc., and Robert A. Coe.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Michael E. Ronnett (Ronnett) brought an action to rescind an alleged investment contract under the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1983, ch. 121½, par. 137.1 *et seq.*) (Securities Law) and to recover monies expended under the agreement. Named as defendants were American Breeding Herds, Inc., Irwin Fischman and Tobin C. Carlin (ABH); Investorplan, Inc., and Robert A. Coe (Investorplan); and, John M. Shannon & Associates, Inc., and Bernard A. Levin (Shannon) (collectively defendants). Defendants' separate motions for summary judgment were granted upon the finding that the agreement

was not the purchase of a security under the Securities Law.

Ronnett appeals, raising as the principal issue whether the agreement is an investment contract or security subject to the Securities Law.

Ronnett, a full-time practicing physician, claimed to have received investment advice from Shannon from time to time and was allegedly counseled to invest in a cattle breeding plan offered by ABH. In November 1972, Ronnett entered into a contract with ABH for the purchase of 36 Charolais cows at $3,000 per head and a one-quarter interest in a Charolais bull at $5,000, totalling $113,000. The contract allowed Ronnett one breeding privilege for each cow, with the selection of the sire reserved exclusively to ABH. Ronnett paid $50,000 by check to the order of Investorplan and executed a nonrecourse installment promissory note for $74,520, payable over a term of seven years to ABH. Within the same contract and during the same term, Ronnett also agreed to pay quarterly maintenance fees of $80 per animal. The ABH agreement described itself as a "tax shelter program * * * unlike the purchase of securities such as stocks and bonds." Upon 90 days' written notice to ABH, Ronnett was entitled to cancel the maintenance program, with the decision as to whether to sell at public or private auction reserved solely to ABH. From 1972 through 1977, Ronnett paid ABH approximately $204,000. When, in June 1977, Ronnett requested their sale, the herd was sold at auction together with the cattle owned by others. He received a settlement check from ABH in the amount of $7,016.27. Under the contract, ABH reserved certain other powers exclusively to itself, including: maintenance and fee for the animals; and the choice of location for maintenance of the animals, ABH employees to "maintain complete jurisdiction and control of the animals."

Pursuant to the agreement, 36 cows were ear-tagged and identified as Ronnett's. They were shipped to an ABH approved breeding ranch where they were intermingled with those owned by others. He received periodic status reports and, after personally inspecting his herd and the facilities, indicated he was satisfied with the care given to the animals.

In a 1975 meeting with Shannon's representative to discuss the high cost of herd maintenance, Ronnett was told that although the cattle market was depressed, the high costs would "turn around." The cattle market did not improve, however, and Ronnett assented to an ABH proposal to join other investors who were selling their cattle at an auction. He was aware that he would incur some loss. Ronnett's tax returns for 1972-77 indicate tax deductions and credits, in connec-

tion with the cattle, of over $190,000.

In 1977, after Ronnett's attorneys were advised by the Illinois Secretary of State that no report of exemption under the Securities Law was on record regarding the ABH agreement, they filed a complaint against ABH, Investorplan and Shannon, asserting that the ABH agreement was not an exempt transaction under section 4 of the Securities Law (Ill. Rev. Stat. 1977, ch. 121½, par. 137.4), no report of sale was filed in accordance with section 4G of the Securities Law (Ill. Rev. Stat. 1977, ch. 121½, par. 137.4G) and that that transaction was in violation of section 12 of the Securities Law (Ill. Rev. Stat. 1977, ch. 121½, par. 137.12). Ronnett sought rescission of the agreement and a refund of all monies paid. A nine-count second amended complaint, filed in December 1978, added claims for breach of alleged fiduciary duties against Shannon. Shannon's answer to the second amended complaint denied that the agreement was a security, requested the court to dismiss the complaint and set forth affirmative defenses, including failure to tender the alleged security to the court or defendant and failure to comply with the applicable statute of limitations under the Securities Law. (Ill. Rev. Stat. 1977, ch. 121½, pars. 137.13A, 137.13B, 137.13D.) Investorplan and ABH filed separate motions to dismiss the second amended complaint. All motions were denied. Investorplan and ABH subsequently filed answers. Investorplan and Levin filed counterclaims against ABH seeking indemnification. ABH's answer to the counterclaims denied any such liability, setting forth affirmative defenses. These counterclaims are still pending.

Shannon moved for summary judgment, claiming that Ronnett: suffered no injury because the tax benefits he received offset any loss; cannot tender the security as required by the Securities Law; failed to establish the existence of a fiduciary relationship; failed to prove common law fraud; and, Shannon was not a party to the transaction. Attached to the motion were two affidavits. The first, by Shannon's attorney, indicated Ronnett realized a tax savings of $118,986. In the second, Levin denied any involvement between himself and ABH, between Shannon and ABH, or between himself and Shannon (other than rental of office space). Ronnett responded that material issues of fact existed and attached his own affidavit averring: he relied on Shannon for financial advice; Shannon recommended that he invest in ABH; the Investment was consummated by Investorplan; and, communications from Levin on a Shannon letterhead listed Levin as its executive· vice-president. The circuit court found that Shannon could not set off Ronnett's tax benefits against the amount of monies paid

and that tender of the agreement constitutes adequate tender under the Securities Law. Summary judgment was denied with respect to Ronnett's counts for rescission and the counts alleging breach of fiduciary duty. The motion as to the alleged violations of fiduciary obligations under two counts of the second amended complaint was thereafter denied.

Investorplan's subseqûent motion for summary judgment, claiming the agreement was not a security, was granted. The court found that Ronnett's ownership, maintenance and control over identifiable cattle, and his right to sell and his sale of the cattle in 1977, removed the agreement from consideration as a security. For the same reasons, ABH's motion for summary judgment was also granted. Shannon's summary judgment motion was thereafter reconsidered and allowed on the same grounds.

■ The principal issue presented in this appeal is whether the transaction between the parties amounted to an investment contract, in which case it would be deemed a security under section 2.1 of the Securities Law (Ill. Rev. Stat. 1983, ch. 121½, par. 137.2—1) and thereby subject to the provisions of that law. The Federal Securities Act of 1933 and the Securities Law are substantially similar; therefore, Illinois courts have adopted the United States Supreme Court construction of "investment contract" under the Federal act as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." (*Securities & Exchange Com. v. W. J. Howey Co.* (1946), 328 U.S. 293, 298-99, 90 L. Ed 1244, 1249, 66 S. Ct. 1100 (*Howey*); *Norville v. Alton Bigtop Restaurant, Inc.* (1974), 22 Ill. App. 3d 273, 278-79, 317 N.E.2d 384.) In application of *Howey* to a given transaction, the substance rather than the form of the transaction controls, as does the relationship between the parties. Further, emphasis is placed on the economic reality of each situation presented. *Condux v. Neldon* (1980), 83 Ill. App. 3d 575, 404 N.E.2d 523; *Polikoff v. Levy* (1965), 55 Ill. App. 2d 229, 204 N.E.2d 807, *cert. denied* (1965), 382 U.S. 903 15 L. Ed. 2d 156, 86 S. Ct. 237; *Meihsner v. Runyon* (1960), 23 Ill. App. 2d 446, 163 N.E.2d 236; *Sire Plan Portfolios, Inc. v. Carpentier* (1956), 8 Ill. App. 2d 354, 132 N.E.2d 78; Young, *Exemptions From Registration Under the Illinois Securities Law of 1953*, 1961 U. Ill. L.F. 205.

No defendant questions that Ronnett invested his money in this arrangement. The remaining issues to be resolved under *Howey* are whether there was a "common enterprise" between Ronnett and ABH and whether Ronnett was led to expect profits "solely" from

the efforts of ABH, as he claims, by virtue of ABH's exclusive right to determine the location, control and breeding of the herd, its sole control over the place, time and mode of sale, and the fact that the animals were never registered in his name with the American International Charolais Association.

■ Defendants argue that "common enterprise" requires a relationship among investors, sometimes referred to as "horizontal" commonality, not a relationship between the promoter and an investor, also called "vertical" commonality. The terms "horizontal" and "vertical" commonality relate to tests utilized by Federal courts in ascertaining whether a common enterprise may be found in a particular transaction. A common enterprise is said to exist under "horizontal" commonality when there is a linkage between the fortunes of individual investors and other investors by reason of the entire venture's success or failure. Common enterprise is said to exist under "vertical" commonality when the investor's fortunes are interwoven with and dependent upon the success of the promoter. See *Securities & Exchange Com. v. Koscot Interplanetary, Inc.* (5th Cir. 1974), 497 F.2d 473; *Securities & Exchange Com. v. Glenn W. Turner Enterprises, Inc.* (9th Cir. 1973), 474 F.2d 476, 482 n.7, *cert. denied* (1973), 414 U.S. 821, 38 L. Ed. 53, 94 S. Ct. 117.

■ Upon applying the Federal test of "horizontal" commonality, the record in this case fails to support Ronnett's assertion that a common enterprise existed under the statute. His account was not dependent upon the success or failure of any other investor under the ABH agreement. Conversely, the success or failure of other investors as a group had no direct impact on Ronnett's profit or loss. (*Milnarik v. M-S Commodities, Inc.* (7th Cir. 1972), 457 F.2d 274, 276-77, *cert. denied* (1972), 409 U.S. 887, 34 L. Ed. 144, 93 S. Ct. 113.) There is no evidence in the record as to how many other investors participated in the ABH plan, nor whether the ABH contract is traded publicly, nor whether each account sold is individually managed. Nevertheless, from the exhibits attached to the motions and responses, it is clear that Ronnett's account was placed in a segregated fund and treated individually. The record also lacks evidence that any other investor's funds were pooled with Ronnett's. Although Ronnett was invited to allow his cattle to be sold at auction along with cattle owned by other investors, he could have declined the offer.

■ With regard to "vertical" commonality, however, the conclusion compelled is that a common enterprise did exist between ABH and Ronnett. The underlying format of the contract required Ronnett to purchase individual cows and a fractional interest in a bull. For its

part, under its maintenance agreement, ABH undertook to build up the herd for the ultimate purpose of sale and profit. As a practical matter, the contract precludes Ronnett, the individual investor, from involving himself in any maintenance or breeding aspect related to the enterprise. Maintenance and breeding were vital to the success or failure of the scheme. ABH reserved unto itself those powers directly connected with and dependent upon the success of the enterprise: the selection of a sire for breeding purposes; the choice of location as to where the herd would be raised under ABH's complete jurisdiction and control; and the breeding methods, maintenance and feed provided for the animals. Ronnett was permitted to observe his herd, and he commented upon his satisfaction with the way things were going; yet, he could not have participated in the foregoing vital aspects of the operation in terms of its potential for success since they were within the sole control of ABH. In cases involving similar promotions in breeding and raising animals for sale, courts have held that where, as here, the promoter is charged with performing every act necessary to increase the size of the herd, which is the profit making aspect thereof, the necessary dependency by the investor upon the promoter's acts is present. *Kemmerer v. Weaver* (7th Cir. 1971), 445 F.2d 76; *Continental Marketing Corp. v. Securities & Exchange Com.* (10th Cir. 1967), 387 F.2d 466; *Barry v. Ceres Land Co.* (1982), Fed. Sec. L. Rep. (CCH) par. 99,008 (Dec. 21, 1982); *McLish v. Harris Farms, Inc.* (E.D. Cal. 1980), 507 F. Supp. 1075; *Plunkett v. Francisco* (N.D. Ga. 1977), 430 F. Supp. 235; *Securities & Exchange Com. v. Payne* (S.D.N.Y. 1940), 35 F. Supp. 873; *Tomei v. Fairline Feeding Corp.* (1977), 67 Cal. App. 3d 394, 137 Cal. Rptr. 656; *Marshall v. Harris* (1976), 276 Or. 447, 555 P.2d 756; *People v. Witzerman* (1972), 29 Cal. App. 3d 169, 105 Cal. Rptr. 284; *Hollywood State Bank v. Wilde* (1945), 70 Cal. App. 2d 103, 160 P.2d 846.

In contrast, in a case involving a similar cattle raising agreement (*Nichols Charolais Ranch, Inc. v. Barton* (M.D. Fla. 1975), 460 F. Supp. 228, *aff'd* (5th Cir. 1979), 587 F.2d 809), the court examined the sale and maintenance agreement entered into there and noted that the putative investor retained the right to sell and actually personally sold some of the cattle he had purchased from the promoter. He acquired additional cattle and bulls on his own, as well as semen, directing the promoter as to their use with respect to the enlargement of the herd. The purchaser in *Nichols* also directed the removal of his cattle from the promoter's ranch when he became dissatisfied with the arrangement. Under these circumstances, the court found no common enterprise to exist. Here, Ronnett had no right to exercise any

of those powers. His fortune was interwoven with and dependent upon ABH's successful breeding, maintenance and sale of the cattle. Whether Ronnett's cattle and proceeds were intermingled with that of other investors or whether his payments maintained his specific ear-marked cattle is of no significance here since, under the "vertical" commonality test, the concern is fixed upon the relationship between the individual investor and promoter.

The third aspect of the *Howey* test is an expectation of profits "solely" from the efforts of others. Federal courts have rejected a literal application of "solely" because it would frustrate the remedial purposes of the securities law. (*Securities & Exchange Com. v. Glenn W. Turner Enterprises, Inc.* (9th Cir. 1973), 474 F.2d 476, 482, *cert. denied* (1973), 414 U.S. 821, 38 L. Ed. 53, 94 S. Ct. 117; *Hector v. Wiens* (9th Cir. 1976), 533 F.2d 429, 433.) A literal application of "solely" is also rejected in Securities Law, Rule 200, 1A Blue Sky L. Rep. (CCH) par. 22,631 (1980):

> "The term 'investment contract' means and includes: (A) any interest or participation in a contract, transaction, scheme, common enterprise, or profit-seeking venture whereby the investor transfers capital to the promoter or promoters thereof or invests therein *and looks to the promoter or promoters for the success of the venture* \*\*\*." (Emphasis added.)

■ An enterprise is deemed to be a security where, as here, the investor is without real control or has little or no control over the enterprise (*Sire Plan Portfolios, Inc. v. Carpentier* (1956), 8 Ill. App. 2d 354; *Meihsner v. Runyon* (1960), 23 Ill. App. 2d 446), as compared with those situations in which the investor has an equal right of or shares in the control of the enterprise. *Condux v. Neldon* (1980), 83 Ill. App. 3d 575; *Polikoff v. Levy* (1965), 55 Ill. App. 2d 229; *Kaiser v. Olson* (1981), 105 Ill. App. 3d 1008, 435 N.E.2d 113.

■ Defendants urge that by delegating maintenance responsibilities to ABH via the agreement which contained a privilege of termination, Ronnett possessed significant control over the enterprise, relying on Federal securities law cases which held that purchasing an entire business and hiring a management company to operate the business is not a security because the purchaser chose whether to hire the company, which company to hire, and could dismiss the company. (*Fargo Partners v. Dain Corp.* (8th Cir. 1976), 540 F.2d 912; *Schultz v. Dain Corp.* (8th Cir. 1978), 568 F.2d 612.) Here, however, Ronnett purchased only cattle. An entire business would have included rights to choose and utilize grazing land, feed, shelter and other necessities in addition to the rights ABH reserved unto itself. The maintenance

fees he paid were applied to the purchase of his cattle, not toward the purchase of a cattle business. It is apparent that neither Ronnett nor any of the other purchasers entered into this venture for the purpose of taking delivery of the animals, breeding, raising or marketing the cattle themselves. These activities are performed by persons having the experience and skills necessary to do so. (*Securities & Exchange Com. v. Payne* (S.D.N.Y. 1940), 35 F. Supp. 873, 878.) The requisite control over the cattle from Ronnett's standpoint is absent under these circumstances.

The fact that Ronnett directed the sale of the cattle does not alter this conclusion. There is evidence in the record which shows that he did not "authorize" the sale until "advised" to do so. Ronnett had no demonstrated expertise in cattle breeding or selling upon which he could base decisions regarding this cattle investment. Ronnett, as a "knowledgeable investor" in previous transactions, does not necessarily mean that he knew how to increase profits from his cattle investment; it could also mean that he was aware of the risk of loss involved in investing money. Unless specified by law, private investors are not denied the protection of the securities laws simply because they have some experience or sophistication. (*Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73; *Jenkins v. Dearborn Securities Corp.* (1976), 42 Ill. App. 3d 20, 355 N.E.2d 341.) Furthermore, the ABH contract provides that once authorized "*** to sell any of the animals or their female progeny, on behalf of the Owner *** [ABH] may sell the animals at private sale or public auction, *at American's sole discretion.*" (Emphasis added.) Therefore, Ronnett was limited only to authorizing the sale of the cattle—when, how, where and for what price was within the sole discretion of ABH.

■ Although we find, as did the circuit court, that there is no issue of material fact precluding summary judgment (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005), we conclude the circuit court erred in failing to apply *Howey* and those authorities dealing with animal breeding and maintenance agreements. As a consequence, the circuit court also erred in its conclusion that Ronnett's purchase of cattle was not a security under the Securities Law.

Accordingly, judgment for the defendants is reversed and the cause remanded for further proceedings.

Reversed and remanded.

STAMOS and PERLIN, JJ., concur.