2021 IL App (1st) 201353-U

No. 1-20-1353

Second Division
December 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SHINY INVESTMENTS, LLC, a California Limited Liability Company, and CARLO TABIBI, an Individual, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | No. 2020 L 007089 |
| v. | ) ) | |
| ANTHONY ZEOLI and FREEBORN & PETERS, LLP, an Illinois limited liability partnership, | ) ) ) ) | Honorable Michael F. Otto |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's judgment is affirmed where (1) plaintiff Tabibi failed to allege an injury, (2) the transaction did not involve a security, and (3) Shiny failed to show that defendants' conduct was outside the scope of the conflict-of-interest waiver letter.

¶ 2    Plaintiffs-appellants, Shiny Investments, LLC (Shiny) and Carlo Tabibi filed suit against defendants-appellees, attorney Anthony Zeoli and the law firm of Freeborn & Peters, LLP (Freeborn & Peters), alleging that defendants committed civil conspiracy and legal malpractice by inducing plaintiffs to invest in a real estate scheme. Defendants filed a combined motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1) (West 2020)), which the circuit court granted. Plaintiffs then filed a motion to reconsider, which was denied. On appeal, plaintiffs essentially contend that the circuit court erred when it granted defendants' section 2-619.1 motion because (1) Tabibi, in his individual capacity, had standing to bring the claims; (2) the transaction involved a "security" subject to the Illinois Securities Law of 1953 (Act) (815 ILCS 5/1 *et. seq.* (West 2020)); and (3) a conflict-of-interest waiver letter did not limit defendants' liability. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4    In March 2017, defendant Zeoli, an attorney at the law firm of Freeborn & Peters, contacted Tabibi, his former client and the sole member and manager of Shiny, to discuss a transaction. Zeoli informed Tabibi that his client Gregory Perkins was a real estate investor seeking a loan on behalf of his business, Affordable Homes for Rent I, LLC (Affordable Homes). The purpose of the loan was to finance the purchase of properties.

¶ 5                                 A. Waiver Letter

¶ 6    Zeoli represented both Tabibi and Perkins in the proposed transaction. In connection with the transaction, Zeoli emailed the parties a written conflict-of-interest waiver letter (Waiver Letter) dated April 5, 2017.[1] The waiver letter stated that Freeborn & Peters was asked to advise and

---

[1] The waiver letter is dated April 5, 2014. However, the parties conceded in the proceedings below that the correct date of the letter is April 5, 2017.

represent both Tabibi as the lender and Affordable Homes, Perkins, Tinley Point Centre II, LLC (Tinley), Michael Butler, and Georgina Menyah, as the "Borrower Parties" in connection with the "revolving loan to be made by [Tabibi] (or his affiliate) to [Affordable Homes]."

¶ 7    The letter highlighted that the joint representation presented a conflict of interest and identified the risks associated with such representation. The letter noted that Rule 1.7(a) of the Illinois Rules of Professional Conduct generally prohibits a lawyer from representing a client if that representation involves a concurrent conflict of interest. However, the letter stated that under Rule 1.7(b), Freeborn & Peters may represent the clients because (1) the attorneys involved would be able to provide "competent and diligent representation to each affected client"; (2) the representation was not prohibited by law; and (3) the "representation does not involve the assertion of a claim by one client against another client represented by the firm in the same litigation or other proceeding." The waiver letter stated that Freeborn & Peters' representation of the lender and the borrower parties in the instant matter would be "expressly limited to the drafting of legal documents" and would not include negotiations or due diligence on behalf of any party to the transaction.

¶ 8    Finally, the letter invited the parties to waive conflict and consent to the joint representation by signing and returning the letter. The letter also requested acknowledgement of "further consent to all current or future representation of Lender or Borrower Parties by [Freeborn & Peters] in any unrelated matters that are not directly adverse to the other party." The waiver letter was signed and returned by Tabibi.

¶ 9                                B. Transaction Documents

¶ 10    Zeoli then drafted a Loan and Security Agreement (Agreement), along with other related documents (Instruments). On April 17, 2017, Affordable Homes and Shiny executed the agreement

which identified Affordable Homes as the "Borrower" and Shiny as the "Lender." The agreement stated that the "Borrower has requested that the Lender make a revolving loan to Borrower" in the amount of $500,000 and the "Lender agrees to make advances of the Loan to Borrower from time to time in an aggregate principal amount" to purchase certain properties. With regards to repayment, the outstanding principal amount of each loan advance was to be due and payable, in full, within 10 business days from the date a property was acquired for the first three properties or 5 business days from the date a property was acquired for all other properties. "Together with the payment of each Principal Payment," borrower was to pay lender "a lump sum interest payment" of $45,000. In the event that the payment was not "sooner repaid or accelerated," the agreement provided that the "Borrower shall repay the entire outstanding Principal Balance, together with all accrued and unpaid interest" and "all other amount then outstanding under the Loan Document" on the "Maturity Date" of July 17, 2017.

¶ 11     As security for the transaction, Affordable Homes and its guarantors provided, *inter alia*, multiple pledge and collateral assignments (Pledge), a mortgage on real property located at the 7000 block of 183rd Street in Tinley Park, Illinois (Junior Mortgage), and guaranty by Tinley, Butler, Menyah, Perkins, and Steven Greenberger. That same day, Affordable Homes signed a promissory note to Shiny for $500,000 plus interest.

¶ 12     Affordable Homes failed to make payments by July 17, 2017 and thereby, defaulted on the payment.

¶ 13                          C. Federal Court Action

¶ 14     On January 24, 2019, Shiny filed a six-count complaint against Affordable Homes and its guarantors in United States District Court for the Northern District of Illinois (Federal Action) to collect on payments owed to Shiny under the agreement and promissory note. Counts I and II of

the complaint alleged breach of the promissory note and agreement against Affordable Homes. Count III alleged breach of the guaranty against Tinley, Butler, Menyah, and Perkins. Count IV pertained to the foreclosure of membership interest in Tinley pursuant to the pledge against Tinley, Pinnacle Asset Management, LLC, and Prosperity Property Group, LLC. Count V alleged reformation of the pledge and Count VI alleged fraud against Perkins.

¶ 15    As support, each count alleged that Zeoli contacted Tabibi, informed him that Perkins was seeking a "short-term loan for business," and Perkins confirmed, on behalf of Affordable Homes, that he was seeking such "short-term bridge loan" to secure financing for the purchase of properties. Shiny alleged that on April 17, 2017, the "parties entered into a number of written contracts to memorialize the loan." Shiny alleged that pursuant to the agreement, a principal amount of $500,000 was due within 5 or 10 business days from the "acquisition date," *i.e.,* the anticipated closing date of the properties. Regardless of the acquisition date, Shiny stated that the "entire unpaid principal and interest" was due on the maturity date of July 17, 2017. Shiny alleged that Affordable Homes failed to "make any payment" by the maturity date and therefore, owed approximately $500,000 in principle plus interest. However, Shiny noted that Affordable Homes had since paid $100,000. Additionally, Shiny alleged that the loan was procured through fraud because Greenberger's signature was forged.

¶ 16    On April 4, 2019, Shiny moved for entry of default order and judgment against all defendants. On April 26, 2019, the district court granted Shiny's motion against Affordable Homes and its guarantors in the amount of $1,444,000, which included the unpaid principal amount, interest, and attorney fees.

¶ 17                                    D. State Court Action

¶ 18    On July 2, 2020, plaintiffs filed a two-count complaint against defendants in the circuit court of Cook County. Count I alleged that defendants engaged in a civil conspiracy with Perkins to commit securities fraud in order to induce plaintiffs to proceed with the investment. Specifically, plaintiffs alleged that Zeoli acted as Perkins' "attorney and agent to assist Perkins with the promotion of an investment scheme which not only violated federal and state securities laws," but also a 2009 injunctive order from the Illinois Secretary of State which "barred Perkins and his agents from ever selling investments in the future." Plaintiffs alleged that Perkins' "advance[d] his [unlawful] scheme," by convincing Zeoli "to recruit the [p]laintiffs who were induced by the concerted action of Perkins and [Zeoli] to purchase investment securities from Affordable Homes." The complaint stated that Zeoli participated and advanced the scheme by: (1) "committing securities fraud against the Plaintiff"; (2) preparing documents that violated state and federal securities laws; (3) assisting Perkins to violate the injunctive order; (4) breaching his fiduciary duty of loyalty to Tabibi; (5) "fraudulently misrepresent[ing] by omission and expression that Perkins was a 'good guy' and that no background checks were needed; and (6) "attempting to negotiate a settlement following *** default under the Loan Documents under terms adverse to the interests of Tabibi."

¶ 19    Count II alleged that defendants committed legal malpractice in that "Zeoli and [Freeborn & Peters] through [Zeoli's] actions, breached their duties as [p]laintiffs' attorneys" by committing "negligent acts or omissions," including *inter alia*, jointly representing both parties to the transaction, failing to investigate and disclose Perkins' "prior actions, misrepresentations and overall malfeasance," and "orchestrating a transaction" in violation of Illinois securities law.

¶ 20                    E. Motion to Dismiss

¶ 21    On August 7, 2020, defendants filed a combined section 2-619.1 motion to dismiss plaintiffs' claims. Defendants argued that both counts should be dismissed as to Tabibi pursuant to section 2-615 because he failed to allege that he was "personally damaged by any conduct of the [d]efendants in connection with a loan made by Shiny." Defendants also contended that plaintiffs' civil conspiracy claim should be dismissed pursuant to section 2-615 because Zeoli was legally incapable of conspiring with his clients and plaintiffs failed to plead conspiracy with particularity. With respect to the legal malpractice claim, defendants asserted that the duties alleged to have been breached went beyond the agreed scope of the representation as limited by the waiver letter. Defendants further argued that the agreement was not a "security" under the Act and dismissal pursuant to section 2-619(a)(9) was proper because plaintiffs were judicially estopped from claiming otherwise due to the federal action.

¶ 22    On September 15, 2020, plaintiffs filed their response to defendants' motion. Plaintiffs argued that (1) "the determination of the nature and extent of the damages proximately caused by Zeoli's misconduct is a question of fact and not properly resolved by a 2-619 motion to dismiss"; (2) it was legally possible for attorneys to participate in a civil conspiracy with a client; (3) the actions of Zeoli and Perkins and the reasonable inferences that can be drawn from such actions were sufficient to allege an implicit agreement and thus, a civil conspiracy; (4) the waiver letter did "not nullify his fiduciary duties or immunize Zeoli from [p]laintiffs' malpractice claims"; (5) the agreement is a note or investment contract and thus, a  "security" under the Act; and (6) the federal action did not judicially estop the plaintiffs from seeking redress against Zeoli.

¶ 23    On October 21, 2020, defendants filed their reply. Defendants argued that plaintiffs failed to allege a claim of conspiracy because they did not allege that defendants personally benefitted from the wrongdoing of their clients and did not allege any facts establishing Zeoli's "knowing

agreement with Perkins to harm [p]laintiffs." Defendants further argued that Tabibi alleged no personal or individual loss, a lawyer and client can lawfully limit the scope of the representation, the transaction documents evidenced a loan and not a security, and Shiny was judicially estopped from contending that it did not enter a loan transaction.

¶ 24                          F. Circuit Court's Ruling

¶ 25    At the hearing on the motion, the circuit court dismissed Tabibi's claims with prejudice and Shiny's claims without prejudice. With respect to Tabibi, the court held that the "damages were [Shiny's], not [Tabibi's] individually." The court also found that the complaint did not allege that Tabibi was directly injured and that instead, Shiny was the one that incurred damages because "[a]ll of the transactions went through [Shiny]" as it was "engaged in the loans," "failed to recover," and was the "[p]laintiff in the [f]ederal action." As such, the court dismissed Tabibi's claims as to both counts with prejudice.

¶ 26    Next, the circuit court found as a matter of law that the transaction at issue was a loan rather than purchase of a security because (1) the obligation to repay was not dependent on the success or failure of the business, and (2) there was a "fixed and final deadline for return of all the money invested." The court further found that judicial estoppel applied as "a matter of law" and Shiny was "judicially estopped from denying that the transaction was a loan based on [its] filings in the federal [action]." The court reasoned that "not only the complaint but the motion for default [in the federal action] *** repeatedly characterized the transaction as a loan involving repayment of interest."

¶ 27    With respect to the remaining claims, the court agreed with plaintiffs that "attorneys and clients can conspire where sufficient facts are pled." However, the court also agreed with defendants that "an attorney and a client can limit the scope of the representation" and that "Rule

1.8 prohibition against *** self-immunization for malpractice liability does not preclude an agreement to limit the scope of representation." In this particular case, the court found that the complaint was insufficient on both counts because it did not show (1) that defendants owed a duty prior to the date of the waiver letter, and (2) explain how defendants exceeded the limited scope of their representation after the date of the letter. As such, the court dismissed both counts as to Shiny without prejudice, with leave to replead on or before December 7, 2020. Consistent with its ruling, the circuit court entered its dismissal order on November 12, 2020.

¶ 28                                    G. Motion for Reconsideration

¶ 29    On December 2, 2020, plaintiffs moved for reconsideration of the circuit court's ruling or, in the alternative, requested the court dismiss their complaint with prejudice. Plaintiffs argued that the court erred in finding that (1) the investment was not a security by focusing on the principal repayment terms rather than on whether the promised profits were dependent upon the efforts of others; (2) plaintiffs were judicially estopped from claiming that the investment was a security under the Act; (3) Tabibi did not suffer direct damages where the allegations of the complaint showed that Zeoli induced Tabibi and not Shiny to invest; and (4) the waiver letter limits Zeoli's exposure to liability.

¶ 30    On December 7, 2020, the circuit court denied plaintiffs' motion for reconsideration and, at plaintiffs' request, dismissed the complaint with prejudice. Plaintiffs appealed.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, plaintiffs contend that the circuit court erred when it granted defendants' section 2-619.1 motion to dismiss because (1) Tabibi had standing to bring a claim for civil conspiracy and legal malpractice, (2) the agreement was "an investment contract or note subject to regulation under the [Act]," and (3) the waiver letter did not limit defendants' liability.

¶ 33                                    A. Jurisdiction

¶ 34    As an initial matter, we address defendants' argument that Shiny has forfeited its right to appeal because it voluntarily dismissed its claims with prejudice. As plaintiffs point out, it is unclear whether defendants are disputing this court's jurisdiction or simply asserting that Shiny is barred from raising the same arguments on appeal. Regardless, we have an independent duty to evaluate our jurisdiction and dismiss an appeal if jurisdiction is lacking. *Palmolive Tower Condominiums, LLC v. Simon*, 409 Ill. App. 3d 539, 542 (2011). Therefore, we proceed to address the threshold issue of whether an order of voluntary dismissal with prejudice constitutes an appealable order.

¶ 35    Generally, "[e]very final judgment of a circuit court in a civil case is appealable as of right." Ill. S. Ct. R. 301 (eff. Feb. 1, 1994). A judgment or order is " 'final' if it disposes of the rights of the parties, either on the entire case or on some definite and separate part of the controversy." *Dubina v. Mesirow Realty Dev.*, 178 Ill. 2d 496, 502 (1997) (quoting *Village of Niles v. Szczesny*, 13 Ill. 3d 45, 48 (1958)).

¶ 36    Our research has mainly revealed cases pertaining to orders granting a plaintiff's motion to voluntarily dismiss an action without prejudice. In those cases, this court has stated that a voluntary dismissal without prejudice is final and appealable by the defendant, whose rights may be prejudiced by it. *Smith v. P.A.C.E.*, 323 Ill. App. 3d 1067, 1073 (2001) (quoting *Kahle v. John Deere Co.*, 104 Ill. 2d 302, 306-07 (1984)). However, it is not appealable by "the plaintiff, who requested its entry and is protected from prejudice by the right to refile the case within one year." *Id.*; see also 735 ILCS 5/13-217 (West 2020) (allowing plaintiff to refile a cause of action within one year of its dismissal).

¶ 37    Here, the circuit court had initially dismissed Tabibi's claims with prejudice and Shiny's claims without prejudice, allowing Shiny an opportunity to amend its complaint with the necessary allegations. Plaintiffs moved for reconsideration of that ruling or, in the alternative, requested the court to dismiss their complaint with prejudice. The court then denied the motion to reconsider and entered an order dismissing the complaint with prejudice. This amounted to a voluntary dismissal of Shiny's claims which were previously dismissed without prejudice. Because all the claims were dismissed and disposed of the rights of the parties, the order as to Shiny was final. See *Dubina*, 178 Ill. 2d at 502 ("A dismissal with prejudice is usually considered a final judgment.").

¶ 38    Although Shiny had requested the entry of the dismissal order, it was not "protected from prejudice." Unlike a voluntary dismissal without prejudice, a plaintiff who takes a dismissal with prejudice is "forever barred from refiling." *Douglas v. Walter*, 147 Ill. App. 3d 1070, 1073 (1986). As such, an appeal is the only recourse available to such plaintiff. See *Smith v. Central Illinois Regional Airport*, 207 Ill. 2d 578, 588 (2003) (plaintiff can choose to stand on his complaint and seek "an order dismissing the complaint with prejudice, as a means of obtaining a final, appealable judgment."). Given the finality of an order granting voluntary dismissal with prejudice and appellate review being the only recourse available after such order is entered, we find that the order is appealable, and we have jurisdiction over Shiny's appeal.

¶ 39    To the extent that defendants also contend that Shiny has forfeited its arguments on appeal, we find the argument without merit. Relying on *Van Slambrouck v. Marshall Field & Co.*, 98 Ill. App. 3d 485 (1981), defendants contend that a "voluntary dismissal with prejudice is an abandonment of the claim of law." In *Van Slambrouck,* the plaintiff sought to have a dismissal order vacated after he voluntarily dismissed with prejudice a claim against one of the defendants.

*Van Slambrouck*, 98 Ill. App. 3d at 485. This court affirmed the circuit court's refusal to vacate, finding that the plaintiff was "barred by the doctrines of res judicata and collateral estoppel from bringing a second action against the same defendant alleging any matter relating to the same causes of action which was or might have been litigated in the first suit." *Id.* at 487. Unlike *Van Slambrouck*, plaintiffs here neither sought to vacate the dismissal order nor did they attempt to file a second suit. Instead, plaintiffs are seeking appellate review of an initial action. See *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389-90 (2001) (*res judicata* is "a bar against the prosecution of a second action" and "collateral estoppel applies when a party, or someone in privity with a party, participates in two separate and consecutive cases."). Therefore, Shiny has not forfeited its claim.

¶ 40                              B. Motion to Strike

¶ 41    In a motion taken with the case, plaintiffs argue that the alternative statement of facts that defendants included in their appellate response brief should be stricken. Specifically, plaintiffs contend that defendants cannot attack their statement of facts and provide alternative facts because the "propriety of a statement of facts cannot be brought within a response brief but must be advanced by a way of a motion," it is "improper to make a conclusory allegation that a party's statement of facts violates [supreme court rules] without specifying exactly which allegations are argumentative or improper," and plaintiffs' statement of facts complies with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020).

¶ 42    Generally, a request to strike a party's statement of facts must be made in a concurrent motion. *John Crane Inc. v. Admiral Ins. Co.*, 391 Ill. App. 3d 693, 698 (2009). However, defendants here did not file a concurrent motion seeking such relief but instead, made this request in their response brief. Additionally, "we will not strike a party's statement of facts unless it includes such flagrant improprieties that it hinders our review of the issues." *John Crane Inc.*, 391

Ill. App. 3d at 698. Plaintiffs' brief includes "improprieties" as it fails to comply with Rule 341(h)(6), which requires an appellant to include a statement of facts "necessary to an understanding of the case, stated accurately and fairly without argument or comments, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Here, plaintiffs' statement of facts is replete with argument and comment including, *inter alia*, statements that characterize Perkins as a "serial fraudster" with "unsavory character" who engaged Zeoli to assist him "in finding investors for a new scam" and the 2017 transaction being akin to "prior Perkins' scams."

¶ 43    Our supreme court's rules "are not aspirational" and "are not suggestions," but rather, "[t]hey have the force of law, and the presumption must be that they will be obeyed and enforced as written." *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995). Nevertheless, we do not find it necessary to strike plaintiffs' statement of facts because non-compliance with Rule 341(h)(6) does not hinder our review of the issues presented. Instead, we will simply disregard any improper statements which do not comply with the briefing rules and proceed to address the merits. *John Crane Inc.*, 391 Ill. App. 3d at 698; Ill. S. Ct. R. 341(h)(6), (i) (eff. Oct. 1, 2020) (rules regarding briefs filed by the appellant and appellee).

¶ 44                                      C. Standard of Review

¶ 45    Prior to addressing the merits of plaintiffs' claims, we must first determine our standard of review. This appeal challenges the grant of defendants' 2-619.1 motion to dismiss. Section 2-619.1 of the Code permits a party to combine a section 2-615 motion to dismiss (735 ILCS 5/2-615 (West 2020)) with a section 2-619 motion to dismiss (735 ILCS 5/2-619) (West 2020). A section 2-615 motion challenges the legal sufficiency of a complaint based on defects apparent on the face of the complaint. *Strauss v. City of Chicago*, 2021 IL App (1st) 191977, ¶ 34. In contrast, a section 2-

619 motion to dismiss admits the legal sufficiency of the complaint but asserts an affirmative defense or other outside matter that defeats the claim. *Norabuena v. Medtronic, Inc.*, 2017 IL App (1st) 162928, ¶ 14. When ruling on a motion to dismiss under either section 2-615 or section 2-619, a court accepts all well-pleaded facts in the complaint as true and draws all reasonable inferences from those facts in favor of the nonmoving party. *Edelman, Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 164 (2003). "As a reviewing court, we may affirm the judgment of the circuit court on any basis appearing in the record." *Gatreaux v. DKW Enterprises, LLC*, 2011 IL App (1st) 103482, ¶ 10. We review a combined section 2-619.1 motion to dismiss *de novo*. *Id.*

¶ 46                                     D. Tabibi's Claims

¶ 47    We first turn to plaintiffs' argument that the circuit court erred in finding that Tabibi lacked standing to pursue his claims against defendants. Defendants, on the other hand, point out that the court did not dismiss Tabibi's claims for lack of standing, but instead found that he failed to allege facts demonstrating an injury separate from Shiny. In reply, plaintiffs argue that the "distinction is at best academic" and the "record is replete with allegations that Tabibi suffered damages in his individual capacity."

¶ 48    Our supreme court has recognized that "because a plaintiff can sustain a cause of action only where he or she suffered some injury to a legal right, harm caused by the defendant's conduct is an essential element of every cause of action." *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 31. As such, "an allegation that the plaintiff has suffered an injury resulting from the defendant's action is both a pleading requirement and a prerequisite of standing." (Internal citations omitted.). *Id.* Therefore, regardless of whether the failure to satisfy the requirement is characterized as a lack of

standing or a pleading deficiency, the relevant issue here is whether Tabibi, in fact, alleged an injury.

¶ 49    Tabibi pled an injury based on two causes of action: civil conspiracy and legal malpractice. A civil conspiracy is an intentional tort which is defined as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Buckner v. Atlantic Plant Maintenance, Inc.,* 182 Ill. 2d 12, 23 (1998). To state a claim for civil conspiracy, "a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). In addition, the plaintiff must allege an injury caused by the defendant. *Pawlikowski v. Toyota Motor Credit Corp.*, 309 Ill. App. 3d 550,564 (1999). The civil conspiracy theory extends liability for a tort beyond the actual tortfeasor to any coconspirators who might have encouraged, facilitated, or planned the tort in furtherance of the conspiracy. *McClure*, 188 Ill. 2d at 133.

¶ 50    To prevail on a legal malpractice claim, plaintiff must plead and prove that the defendant owed the plaintiff a duty arising from their attorney-client relationship, that the defendant breached that duty, and that as a proximate result, the plaintiff suffered injury. *Sexton v. Smith,* 112 Ill. 2d 187, 193 (1986). The injury in a legal malpractice action is not the defendant's negligent act itself. *Palmros v. Barcelona*, 284 Ill. App. 3d 642, 646 (1996). Rather, the plaintiff is "not considered to be injured unless and until he has suffered a loss for which he may seek monetary damages." See *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). Actual damages are never presumed. *Griffin v. Goldenhersh*, 323 Ill. App. 3d 398, 404 (2001).

¶ 51    Defendants argue that because Shiny is a California limited liability company, Illinois courts apply the law of the state of incorporation and therefore, California law would govern the instant issue of whether Tabibi, as the sole member and manager of Shiny, alleged an injury. Regardless of which state law governs, defendants contend that Tabibi cannot prevail because he cannot pursue Shiny's claim as his own. Essentially, defendants argue that Shiny cannot allege direct harm.

¶ 52    Defendants' argument raises a question regarding choice of law. A choice-of-law analysis presupposes there is a conflict in the relevant law of two jurisdictions. *Gleim v. Roberts*, 395 Ill. App. 3d 638, 641 (2009). As such, prior to engaging in the analysis, a court must be assured that a conflict exists. *Id.* Although defendants argue that California law would apply because Shiny is a California company, Tabibi's claims of civil conspiracy, violations of securities law, and legal malpractice are governed by Illinois law. Because we cannot ascertain any substantive difference between California and Illinois law as to the general legal principles pertaining to LLC, corporations, and concepts such as direct and derivative harm, it would be improper for this court to perform a choice-of-law analysis. *Kramer v. Weedhopper of Utah, Inc.*, 204 Ill. App. 3d 469, 474 (1990) ("Conflicts rules are applied only when a difference in law will make a difference in the outcome."). Furthermore, the parties do not argue that the law of the two jurisdictions conflict and therefore, we proceed to apply Illinois law as to the issue before us. See *SBC Holdings, Inc. v. Travelers Casualty & Surety Co.*, 374 Ill. App. 3d 1, 13 (2007) ("In the absence of a conflict, Illinois law applies as the law of the forum.").

¶ 53    A "limited liability company (LLC) is [deemed to be] a legal entity distinct from its members" which has its own "legal rights and obligations." *Peabody-Waterside Development, LLC v. Islands of Waterside, LLC*, 2013 IL App (5th) 120490, ¶ 9. A member of an LLC owns

only its membership interest in the LLC. *Id.* An LLC is a "hybrid form" of doing business that combines the advantages of a corporation's limitation on personal liability with a partnership's tax benefits. See *First Mid-Illinois Bank & Trust, N.A. v. Parker*, 403 Ill. App. 3d 784, 792 (2010). As such the same principles that apply to corporations as to non-taxation issues govern an LLC. See *Flynn v. Maschmeyer*, 2020 IL App (1st) 190784, ¶ 91 (applying corporate shareholder rules to members of an LLC). Accordingly, we look to caselaw on corporations to resolve the issue before us.

¶ 54    Generally, a corporate shareholder, experiencing no direct harm, has no standing to sue in his or her own right as a shareholder. *Mann v. Kemper Financial Companies, Inc.*, 247 Ill. App. 3d 966, 975-76 (1992) (quoting *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970)). To acquire standing to sue individually, a shareholder must allege more than an indirect harm. *Id.* An indirect harm is an injury inflicted directly on the corporation and felt by the shareholder only because he or she owns shares of the company. *Id.* "It is settled that if an injury is incurred by the corporation, then the shareholders can only sue upon a derivative basis and not as individuals." *Bio-Scientific Clinical Laboratory, Inc. v. Todd*, 149 Ill. App. 3d 845, 850 (1986); see also *Small v. Sussman*, 306 Ill. App. 3d 639, 643 (1999). However, a shareholder with a direct, personal interest in a cause of action may bring a lawsuit against a defendant even if the corporation's rights are also implicated. *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill. App. 3d 58, 62 (2002). The determination of "whether a cause of action is derivative or direct requires a strict focus on the nature of the alleged injury," that is, whether the injury is to the corporation or the individual shareholder. *Alpha School Bus Company, Inc. v. Wagner*, 391 Ill. App. 3d 722, 746 (2009).

¶ 55    Here, Tabibi did not enter into a transaction with Affordable Homes but rather, it was Shiny. This is evidenced by the agreement and instruments which identify Shiny as the lender party. The complaint also asserts that Shiny was created so that Shiny and not Tabibi could engage in transactions. Specifically, the complaint asserts that Shiny was established in 2015, two years prior to the transaction at issue as a general "vehicle to hold title to certain investments undertaken by Tabibi." In the case at bar, Tabibi chose to facilitate his transactions through Shiny in its LLC form and thus, was not personally liable for the transaction. Even if Tabibi is the sole member and manager of Shiny, the LLC is an entity distinct from its members. Although we acknowledge that Tabibi had provided the funds to Shiny to facilitate the transaction and his injuries were personally felt, they were only incurred indirectly through Tabibi's interest in Shiny. As such, Tabibi cannot allege that he suffered harm separate from that suffered by Shiny. Rather, the only damages that Tabibi could allege are the losses incurred by Shiny. With respect to the legal malpractice claim, we acknowledge that the waiver letter was signed by Tabibi and identified him as the lender. However, given that Tabibi's claims for malpractice are premised on the injury he suffered due to the transaction entered into by Shiny, we find that the malpractice claim was also properly dismissed. As such, we find that the court correctly dismissed Tabibi's claims.

¶ 56                                    E. Shiny's Claims

¶ 57    Having found that Tabibi cannot assert his claims on appeal, we turn to address Shiny's argument that it purchased either an "investment contract" or a "note" and therefore, a "security" within the meaning of the Act.

¶ 58                                    1. Judicial Estoppel

¶ 59    Prior to addressing the merits, we must address Shiny's argument that judicial estoppel did not apply to bar its claim that it purchased a "security."

¶ 60     Judicial estoppel is an equitable doctrine invoked to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Seymour v. Collins*, 2015 IL 118432, ¶ 36. The doctrine applies "when litigants take a position, benefit from that position, and then seek to take a contrary position in a later proceeding." *Id.* The doctrine "is flexible and not reducible to a pat formula." *Smeilis v. Lipkis*, 2012 IL App (1st) 103385, ¶ 46. The analytical framework for determining whether judicial estoppel should bar a claim is a two-step process. *Seymour*, 2015 IL 118432, ¶ 47. First, the court must determine whether the party to be estopped has (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) has succeeded in the first proceeding and received some benefit. *Id.* "The party asserting judicial estoppel must prove that the doctrine applies by clear and convincing evidence." (Internal quotation marks omitted.) *Davis v. Pace Suburban Bus Division of the Regional Transportation Authority*, 2021 IL App (1st) 200519, ¶ 29. "The heightened burden of proof is a reflection that the doctrine of judicial estoppel is an extraordinary one which should be applied with caution." (Internal quotation marks omitted.) *Id.*

¶ 61     Second, even "if all [five] prerequisites have been established, the court must determine whether to apply judicial estoppel — an action requiring the exercise of discretion." *Seymour*, 2015 IL 118432, ¶ 47. In doing so, "multiple factors" may inform the court's decision, including "the significance or impact of the party's action in the first proceeding, and *** whether there was an intent to deceive or mislead, as opposed to the prior position having been the result of inadvertence or mistake." *Id.*

¶ 62     We begin our analysis by determining the standard of review. Shiny makes no argument as to the applicable standard governing our review, whereas defendants contend that our review is

*de novo* because the circuit court's ruling disposes of the litigation. Given the equitable nature of the doctrine, we typically review a judicial estoppel determination for an abuse of discretion. *Id.* ¶ 48. However, our supreme court in *Seymour* held, "where the exercise of [a court's] discretion results in termination of the litigation, and that result is brought about via the procedural mechanism of a motion for summary judgment, it follows, as well, that we review that ruling *de novo*." *Id.* ¶ 49.

¶ 63    In the case before us, defendants filed a combined 2-619.1 motion to dismiss instead of a motion for summary judgment. Defendants argued that dismissal was proper pursuant to section 2-619(a)(9) because judicial estoppel barred Shiny from claiming that the transaction was not a loan. The circuit court granted defendants' motion. Although the appeal in *Seymour* stemmed from the circuit court's grant of a motion for summary judgment, this court has found that *de novo* review extends to a judicial estoppel determination brought via a 2-619 motion to dismiss. See *Johnson v. Fuller Family Holdings, LLC¸* 2017 IL App (1st) 162130, ¶ 36. This is because a 2-619 motion resembles the grant of summary judgment and the standards of review for both are the same. *Id.* As such, we proceed with our analysis *de novo*. This not only means that "we review *de novo* whether the five factors were met; it also means that if we find they are met, we then determine, in *our* discretion, without deference to the [circuit] court, whether and how to apply that doctrine." *Davis*, 2021 IL App (1st) 200519, ¶ 32.

¶ 64    Having determined the applicable standard of review, we turn to the five prerequisites for judicial estoppel. The parties do not dispute that the federal action and the instant case are "separate judicial proceedings," that Shiny intended the representations made in those proceedings to be accepted as true by the trier of fact, and that Shiny succeeded in the first proceeding and received some benefit from it. The parties, however, dispute whether Shiny took two factually inconsistent

positions. Defendants contend that Shiny should be judicially estopped from arguing that the transaction involved a security because Shiny characterized the agreement or instruments as loans in the federal action. Shiny contends that it did not take two factually inconsistent positions because it merely sought to collect on the "investment in accordance with the terms of the legal documents" in the federal action whereas, the present case involves plaintiffs seeking to hold Zeoli accountable for violating securities law. According to Shiny, it was "required to employ the nomenclature [used] by Zeoli" and its characterization of the agreement in the federal action "does not contradict the [p]laintiffs' position here, that the Investment Documents as written violate the Securities Law." As such, the main issue before us is whether Shiny has taken two factually inconsistent positions.

¶ 65    We note that in its federal complaint, Shiny characterized  the agreement as a "short-term loan for business," and stated that Perkins confirmed, on behalf of Affordable Homes, that he was seeking such "short-term bridge loan" to secure financing for the purchase of properties. Additionally, Shiny asserted that the "parties entered into a number of written contracts to memorialize the loan." In the instant case, Shiny contends that the transaction involved an "investment contract" or a "note" and therefore, a "security" within the meaning of the Act. Although, in the federal action, Shiny characterized the instruments as a loan to collect a debt, notes (which are by statutory definition securities as later discussed) are also debt instruments. See *Bell Federal Sav. and Loan Ass'n v. Wagner*, 286 Ill. App. 3d 521, 526 (1996) ("notes *** [are] debt instruments that include, in general, promises to pay specified amounts at specified times."). Because both loans and notes are debt instruments, the characterization of the agreement and instruments as loans and not notes in the federal action is not so inconsistent as to warrant application of judicial estoppel. Further, regardless of the labeling of the documents and its

characterization, the issue of whether the transaction involved a security under the Act is a legal determination and therefore, the doctrine of judicial estoppel does not apply. See *Huang v. Brenson*, 2014 IL App (1st) 123231, ¶ 40 ("Judicial estoppel applies to statements of fact and not to legal opinions or conclusions.").

¶ 66    However, we find that Shiny made factually inconsistent statements as to when repayment was due. Defendants argue that "in its  federal action, [Shiny] never claimed that its return was dependent on Affordable [Homes'] success, but rather that it asked for and accepted an award of interest based on the maturity date of the loan." We note that in the instant matter, Shiny contends that payment was due within 5 or 10 business days from when Perkins' acquired property. However, in the federal action, Shiny acknowledged that "[r]egardless of the [a]cquisition [d]ate, *** the entire unpaid principal and interest was due on the maturity date of July 17, 2017." As such, there was a clear factual inconsistency as to when repayment was due. Therefore, we find that all five factors of judicial estoppel were met.

¶ 67    Having determined that all five prerequisites are met, we must proceed to the second step of the analysis and exercise our discretion in determining whether to apply judicial estoppel. We briefly note that it does not appear that the circuit court had engaged in the second step by exercising its discretion. In its oral ruling granting defendants' motion to dismiss, the court found that the prerequisite elements of "judicial estoppel" were present but did not discuss its discretion or any equitable factors, such as the significance or impact of Shiny's action in the federal proceeding or whether Shiny intended to deceive or mislead the court. Similarly, the court's written order provided that the "motion is granted for the reasons stated in the transcript of proceedings" but was silent as to the court's consideration of the second-step factors and whether the court exercised its discretion. Likewise, the December 7, 2020 order denying plaintiffs' motion

to reconsider also does not show that the court exercised discretion. In any event, as we exercise our own discretion in the instant matter, we consider it independently from the reasoning employed by the circuit court.

¶ 68    Shiny contends that even if all the five prerequisites are met, judicial estoppel would not apply to bar a subsequent action unless the court also finds that the party intended to deceive or mislead, as opposed to inadvertently or mistakenly taking a prior inconsistent position. In other words, Shiny asserts that the "intent to deceive or mislead" is a critical factor in deciding whether to apply judicial estoppel. Because Shiny disclosed in its complaint that a federal action had been filed, judgment was entered in that case, and collection efforts were ongoing, Shiny contends that it did not deceive or mislead the court. Defendants contend that Shiny's argument is without merit because whether a party has the "intent to deceive or mislead" is just one of many factors that a court may consider in determining whether to apply judicial estoppel, nowhere does Shiny argue that the position taken in federal court was a result of inadvertence or mistake, and the deception requirement is particular to bankruptcy proceedings.

¶ 69    We reiterate. In exercising our discretion, we consider factors such as "the significance or impact of the party's action in the first proceeding, and * * * whether there was an intent to deceive or mislead, as opposed to the prior position having been the result of inadvertence or mistake." *Johnson*, 2017 IL App (1st) 162130, ¶ 43. Defendants' argument that courts only apply the "intent to deceive" factor in the context of bankruptcy proceedings is without merit. This court in *Davis* conducted a two-step judicial estoppel analysis and considered the "intent to deceive" element. *Davis*, 2021 IL App (1st) 200519, ¶ 66. There, the two judicial proceedings at issue did not involve bankruptcy but dealt with claims of negligence and insurance coverage. *Id.* As such,

we proceed to consider the significance of Shiny's action in the federal proceeding as well as whether Shiny intended to deceive or mislead the court.

¶ 70    With regards to the significance of Shiny's action in the federal proceeding, we acknowledge that Shiny secured a default judgment on its allegation that the remaining principal and interest amount was due on the maturity date and was not paid. We find it fair to infer that it was beneficial for Shiny to claim that the repayment was due on the maturity date rather than contingent on an unspecified date (*i.e.* the date Affordable Homes or Perkins acquired properties). Shiny's alleged repayment date ensured that it could seek the amount due and not paid as of a definite date of July 17, 2017. As such, Shiny's allegations as to the repayment date was of significance in the federal action.

¶ 71    As to the intent to deceive, defendants contend that Shiny made a "deliberate allegation" and failed to argue that its "affirmative position" in the federal action was a result of inadvertence or mistake. We are reluctant to infer any intent to deceive where the record is limited in this regard and does not support such clear finding. However, contrary to Shiny's assertion that judicial estoppel cannot be "applied to bar a subsequent action" absent a finding that the party intended to deceive or mislead, we find it appropriate to invoke the doctrine of judicial estoppel here for the reasons discussed. See *Davis*, 2021 IL App (1st) 200519, ¶ 72 (finding judicial estoppel applied despite no clear intent to deceive).

¶ 72    We further reject Shiny's argument that "[i]f the lower court's ruling on judicial estoppel were upheld, the "very purpose of the Securities Law would be frustrated" because "a defrauded investor would be presented the Hobson's choice of bringing a legal action to mitigate their damages by collecting on their investment *** or suing the promoter who illegally sold the

investment to them." The court's ruling simply prevents Shiny from changing its position and does not preclude Shiny from filing separate actions.

¶ 73    That being said, we find that the outright termination of the suit or dismissal of Shiny's claim that the transaction involved a security is drastic. *Davis*, 2021 IL App (1st) 200519, ¶ 80 (applying a less drastic remedy). As we previously stated, the determination of whether the transaction involved a security is a legal one. Further, the instant case involves other claims not premised on the securities claim. In sum, we find that Shiny could argue that the transaction involved a security. However, Shiny could not argue that repayment was due as of the "acquisition date" and not the maturity date.

¶ 74                                    2. The Act

¶ 75    We now turn to address Shiny's argument that it purchased either an "investment contract" or a "note" and therefore, a "security" within the meaning of section 2.1 of the Act.

¶ 76    "The determination of whether a financial instrument falls within the definition of a 'security' under the Act is a matter of statutory construction, which presents a question of law subject to *de novo* review." *Van Dyke v. White*, 2019 IL 121452, ¶ 45. The primary goal of statutory construction is to ascertain and give effect to the intent of the legislature. *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 421 (2002). The most reliable indicator of that intent is the "language of the statute, which is to be given its plain and ordinary meaning." *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440, (2010). In determining the plain meaning of statutory terms, a court must "consider the statute in its entirety, the subject it addresses, and the apparent intent of the legislature in enacting it." *Id.* When the statutory language is clear and unambiguous, a court may not depart from the plain language by reading into the statute "exceptions, limitations, or conditions which conflict with the clearly expressed

legislative intent." *County of Knox ex rel. Masterson v. The Highlands, L.L.C.*, 188 Ill. 2d 546, 556 (1999). The language of the statute must be "applied as written, without resort to extrinsic aids of statutory construction." *Solon*, 236 Ill. 2d at 440. However, a court may consider extrinsic aids of construction if a statute can reasonably be understood in more than one way. *Id.*

¶ 77    In determining whether the agreement at issue is a security, we begin by looking at the language of the statute itself. Section 2.1 of the Act defines "security" in pertinent part as "any note, stock, treasury stock, bond, * * * [or] investment contract." 815 ILCS 5/2.1 (West 2020). Because of the similarity between the Federal and Illinois versions of the Act, Illinois courts will look at cases examining the Federal Securities Act to aid in interpreting the scope of the Illinois Act. *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 455 (2004); *Daleiden v. Wiggins Oil Co.*, 118 Ill. 2d 528, 537 (1987).

¶ 78                              a. Investment Contract

¶ 79    Our supreme court has adopted the construction of "investment contract" in *Securities & Exchange Comm'n v. W.J. Howey Co.*, 328 U.S. 293 (1946). Under the "*Howey* test," three elements must be met for an instrument to qualify as an investment contract: (1) an investment of money, (2) in a common enterprise, (3) with profits to come solely from the efforts of others. *Daleiden v. Wiggins Oil Co.*, 118 Ill. 2d at 538. Courts have rejected a formulaic application of the test and instead, have found that "the substance rather than the form of the transaction controls, as does the relationship between the parties" with emphasis placed on the "economic reality" of each situation presented. *Ronnett v. American Breeding Herds, Inc.*, 124 Ill. App. 3d 842, 847 (1984); *Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 558 (1979). In applying the *Howey* test, we note that "[t]he purpose of the Act is to protect innocent persons who may be induced to invest in

speculative enterprises over which they have little control." *Van Dyke v. White*, 2019 IL 121452, ¶ 47.

¶ 80 The first element of *Howey* examines whether there was an investment of money, which "requires that the investor commit his assets to the enterprise in such a way as to subject himself to financial loss." *Payton v. Flynn*, No. 06-465, 2006 WL 3087075, at *7 (N.D. Ill. Oct. 26, 2006) (citing *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003)). Here, Shiny advanced monetary funds to Affordable Homes to purchase properties. In doing so, Shiny exposed itself to the financial risk of not being able to recoup its money. Defendants point out that Shiny was able to "evaluate the likelihood of a refinance *** before it loaned" money because the agreement required Affordable Homes to provide Shiny with a disbursement request. However, the fact that Shiny could choose to provide funds after reviewing the request is immaterial as it was still subject to financial loss by virtue of extending funds. It appears, therefore, that the first element is met.

¶ 81 The second element pertains to whether there was a "common enterprise" between Shiny and Affordable Homes. "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Integrated Research Services, Inc. v. Illinois Secretary of State, Securities Dept.*, 328 Ill. App. 3d 67, 72 (2002). The common enterprise requirement is satisfied where an investment has either horizontal or vertical commonality. *Id.* Horizontal commonality exists where "there is a linkage between the fortunes of individual investors and other investors by reason of the entire venture's success or failure." *Ronnett*, 124 Ill. App. 3d at 848. In contrast, vertical commonality exists where "the investor's fortunes are interwoven with and dependent upon the success of the promoter." *Id.*

¶ 82    Defendants argue that we should analyze the issue under horizontal and not vertical commonality because the Seventh Circuit in *Wals v. Fox Hills Dev. Corp.,* 24 F. 3d 1016 (7th Cir. 1994) and the district court in *Goldberg v. 401 North Wabash Venture LLC*, 904 F. Supp. 2d 820, 848 (N.D. Ill. 2012) require the exclusive application of horizontal commonality. As further support, defendants contend that "[t]he District of Columbia, First, Second, Third, Fourth, and Sixth Circuits also apply or accept horizontal commonality." Because there is no horizontal commonality in the instant matter, defendants argue that the common enterprise element has not been met. Shiny, on the other hand, argues that two decisions of this court, *Integrated Research Services, Inc.* and *Ronnett* allowed the plaintiff to proceed under either test, and we must follow appellate court precedent. See *Integrated Research Services, Inc.*, 328 Ill. App. 3d at 67 (applying vertical commonality); *Ronnett*, 124 Ill. App. 3d at 842 (applying both horizontal and vertical commonality).

¶ 83    "This court is not bound by federal circuit or district court cases*." Miwel, Inc. v. Kanzler*, 2019 IL App (2d) 180931, ¶ 13. While *Wals* and *Goldberg* are federal decisions and are not binding on this court, a federal court's interpretation of Illinois law is persuasive unless it runs contrary to previously decided state cases. See *Mokena Community Park District v. Romanek*, 2020 IL App (3d) 180336, ¶ 13. Unlike *Goldberg*, that involved interpretation of the Illinois Act, the issue in *Wals* was whether a condominium purchase and rental agreement was an "investment contract" within the meaning of the Federal Securities Act. *Wals*, 24 F.3d at 1017. Although *Wals* concerned federal law, we reiterate that Illinois courts may look to cases examining the Federal Securities Act in interpretating the Illinois Act. However, because *Wals* and *Goldberg* run contrary to this court's application of the commonality tests, we proceed to analyze the issue under both horizontal

and vertical commonality consistent with our prior decisions in *Integrated Research Services, Inc.* and *Ronnett*.

¶ 84    Here, defendants argue that the horizontal commonality test is not met because the "[c]omplaint and supporting exhibits identify no pool of other lenders to Affordable [Homes] or 'other investors.' " Shiny contends that because "the record does not establish that Tabibi is the only victim of Perkins' scheme, *** a finding at this stage of the proceedings that horizontal commonality cannot be established is premature." We disagree. It is clear that horizontal commonality does not exist because it requires the pooling of interests among the investors. See *Ronnett*, 124 Ill. App. 3d at 848. No evidence exists in the record that other investors participated in the transaction with their funds "pooled" with Shiny. Even assuming *arguendo* that there were other investors, Shiny's profits or losses were not contingent on the success or failure of other investors. Therefore, no horizontal commonality exists.

¶ 85    With regards to vertical commonality, Shiny asserts that "Tabibi was a passive investor who was promised a profit of $45,000 each time Perkins executed on his business plan and purchased and refinanced" property. Contrary to Shiny's assertion, the transaction documents provided that the repayment of the principal amount and "a lump sum interest" of $45,000 was not contingent on Perkins' or Affordable Homes' success but rather, due as of the un-variable repayment date of July 17, 2017, regardless of any effort or success on Affordable Homes' part. As such, the vertical commonality element also weighs against a finding that the transaction involved a security.

¶ 86    Having determined that the commonality element has not been satisfied, we find that the transaction at issue did not involve an investment contract and therefore, was not a security under the Act. As such, we need not address whether the third prong of the *Howey* test, an expectation

of profits "solely" from the efforts of others, has been met. *Howey*, 328 U.S. at 299; see also *Integrated Research Services, Inc.*, 328 Ill. App. 3d at 73 (stating the test for the third prong is whether "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.").

¶ 87     Furthermore, in examining the relationship between the parties and the "economic reality" of the situation, we find that the transaction was a clearly a loan. Although Shiny argues that we must look at the "substance rather than the form of the transaction," the agreement executed by Shiny and Affordable Homes provided that Shiny was the lender, evidenced by the promissory note and instruments. This indicated that the transaction was a loan with the return to Shiny being in the form of repayment of principal plus interest. See *American Fletcher Mortg. Co., Inc. v. U.S. Steel Credit Corp.*, 635 F.2d 1247, 1254 (7th Cir. 1980). Further, prior to entering into the transaction, Shiny was informed that Perkins was seeking a short-term loan on behalf of Affordable Homes. The fact that Shiny also agreed to make advances of the funds in return for a note indicates that the transaction was a loan. See *Hunssinger v. Rockford Business Credits, Inc.*, 745 F.2d 484, 492-93 (7th Cir. 1984) ("if a bank or other commercial lender makes a loan to finance business transactions and takes a note in return, the parties could not be said to have participated in a securities transaction."). Therefore, the transaction was not a security.

¶ 88     We briefly address Shiny's argument that the circuit court erred by finding that the fixed interest provided in the agreement exempted it from being a security. Citing *SEC v. Edwards*, 540 U.S. 389 (2004), Shiny argues that a fixed return does not exclude an instrument from being a security. However, the circuit court did not hold that the fixed nature of the interest warranted a finding that the transaction was not a security. Instead, the circuit court concluded that repayment of the principal with interest was not contingent on the success or failure of Affordable Homes.

¶ 89                                                      b. Note

¶ 90     Shiny further argues that the agreement constituted a "note" within the meaning of the Act. In *Reves v. Ernst & Young*, 494 U.S. 56, 56 (1990), the U.S. Supreme Court provided a test to determine whether a note is a security. Under *Reves*, the analysis begins with a rebuttable presumption that every note is security unless the note in question "bears a strong resemblance" to one of the following types of instruments that are not considered securities: (1) consumer-financing notes, (2) notes secured by a home mortgage, (3) short-term notes secured by a lien on a small business or its assets, (4) notes evidencing a "character" loan to a bank customer, (5) short-term notes secured by the assignment of accounts receivable, (6) notes formalizing an open-account debt incurred in the ordinary course of business, and (7) notes evidencing loans by commercial banks for current operations. *Id.* at 64.

¶ 91     Four factors are used in measuring a note's resemblance to the categories listed above: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]"; (2) "the 'plan of distribution' of the instrument"; (3) "the reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Act unnecessary." *Reves*, 494 U.S. at 66-67. "Because the factors are considered as a whole, a failure to satisfy one factor is not dispositive." *Chao Xia Zhang-Kirkpatrick v. Layer Saver LLC*, 84 F. Supp. 3d 757, 763 (N.D. Ill. 2015).

¶ 92     Here, defendants argue that the note in question falls within the category of a "short-term note secured by a lien on a small business or its assets." Specifically, defendants argue that the promissory note here was "expressly secured by the business assets of Affordable [Homes]" and further secured by the pledge, junior mortgage, and equity of "affordable-affiliated"

entities/owners. Shiny, on other hand, contends that there was no lien on Affordable Homes because it did not have any assets of its own to secure the investment. However, Shiny fails to explain why the note secured by Affordable Homes' existing and future assets is not sufficient. Further, Shiny fails to explain why the pledge, junior mortgage, and equity of affordable-affiliated entities and owners should not be akin to a lien on the assets of Affordable Homes.

¶ 93    Regardless, we consider the four factors articulated in *Reves* to determine whether the note bears a "family resemblance" to one of the enumerated categories.

¶ 94    Under the first factor, a note resembles a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Reves*, 494 U.S. at 66. Courts must look objectively at "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]." *Id.* Here, Shiny asserts that it entered into the agreement for investment purposes. Affordable Homes' motivation, however, was to obtain short-term cash to purchase and refinance properties. As such, pursuant to *Reves*, Affordable Homes' motivation for cash, makes the note "less sensibly" a security under the first prong. *Id.* ("If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.' "). Therefore, we find this factor weighs in favor of defendants.

¶ 95    The second factor involves a determination of whether "there is a common trading for speculation or investment" of the disputed instrument. "[T]he requisite 'common trading' " is established if the instrument is "offered and sold to a broad segment of the public" *Reves*, 494 U.S. at 68. Here, Affordable Homes offered the agreement and instruments to Shiny. Nothing in the

record or the complaint suggests that Affordable Homes offered them to anyone other than Shiny which does not constitute "a broad segment of the public." Because the agreement and instruments were not offered and sold to a broad segment of the public, the second *Reves* factor favors defendants.

¶ 96    The third factor focuses on whether a reasonable member of the investing public would consider the disputed note an investment. *Id.* at 66. Given the language utilized in the agreement and instruments, the average person would not have considered the disputed transaction to be an investment. The agreement here identified Affordable Homes as the "Borrower" and Shiny as the "Lender." The agreement stated that the "Borrower has requested that the Lender make a revolving loan," that the "Lender agrees to make advances of the Loan to Borrower from time to time in an aggregate principal amount" to purchase certain properties, and the "Borrower shall repay the entire outstanding Principal Balance, together with all accrued and unpaid interest" and "all other amount then outstanding under the Loan Document" on the "Maturity Date" of July 17, 2017. Based on the language of the agreement, a reasonable member of the investing public would not consider the disputed note as an investment. This factor also favors defendants.

¶ 97    The final *Reves* factor, risk reduction, focuses on whether the existence of alternative regulatory schemes or other measures, render the protection afforded by the federal securities laws unnecessary. *Id.* at 67. In *Reves*, the court found that the notes at issue were securities because they were "uncollateralized and uninsured" and there was "no reducing factor to suggest that the [instruments at issue were] not in fact securities." Here, Affordable Homes and its guarantors provided, *inter alia*, pledges, junior mortgage, and personal guaranties as security for the transaction. As such, Shiny had alternative remedies so as to render protection from the Act unnecessary.

¶ 98    In sum, we find that the four *Reves* factors weigh in favor of finding that the agreement and instruments were not a note and therefore, not securities under the Act.

¶ 99    Having found that the transaction at issue is not a security, to the extent that Shiny's claims of civil conspiracy and legal malpractice are premised on defendants' alleged commission of securities fraud or acts in violation of securities laws, they must fail. See *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 49 ("Because conspiracy is not an independent tort, if a plaintiff fails to state an independent cause of action underlying [the] conspiracy allegations, the claim for conspiracy also fails." (Internal quotation marks omitted.)).

¶ 100                              3. Waiver Letter

¶ 101   Lastly, we address Shiny's argument that the court erred in finding that the complaint was insufficient on both counts because it did not show (1) that defendants owed a duty prior to the date of the waiver letter, and (2) explain how defendants exceeded the limited scope of their representation after the date of the letter. With respect to defendants' liability for civil conspiracy, Shiny contends that the waiver letter has "no relevance" because the letter does not "disclose to Tabibi that Zeoli is conspiring with Perkins' to defraud him of $500,000." With regards to the legal malpractice claim, Shiny contends that the complaint clearly stated that "at all times relevant *** Tabibi and his companies had a long-standing attorney-client relationship with [defendants]" and listed "nineteen separate instances where the defendants breached their fiduciary duties arising from their attorney-client relationship."

¶ 102   We first note that the court properly dismissed count I of the complaint as to civil conspiracy. Although the court considered the waiver letter as one of the bases for its dismissal of plaintiffs' claim of civil conspiracy, we may affirm the circuit court's judgment on any basis that is supported by the record. *Gatreaux*, 2011 IL App (1st) 103482, ¶ 10. As previously stated, a civil

conspiracy is defined as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23 (1998). To state a claim for civil conspiracy, a plaintiff must allege facts establishing both: (1) an agreement to accomplish such a goal; and (2) a tortious act committed in furtherance of that agreement. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). An agreement is "a necessary and important" element of this cause of action. *Redelmann v. Claire-Sprayway, Inc.*, 375 Ill. App. 3d 912, 924 (2007).

¶ 103   Because a conspiracy is by its very nature secretive, it is rarely susceptible to "direct proof." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 66 (1994). As such, civil conspiracy may be established " 'from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.' " *McClure*, 188 Ill. 2d at 134 (1999) (citing *Adcock*, 164 Ill. 2d at 66). Nevertheless, Illinois is a fact-pleading jurisdiction, and a plaintiff must allege sufficient facts to bring the claim within the cause of action. *Reuter v. MasterCard Intern., Inc.*, 397 Ill. App. 3d 915, 928 (2010). Accordingly, "conclusory allegations that the defendants agreed with each other to achieve some illicit purpose are not sufficient." *Id.*

¶ 104   Here, the complaint does not allege sufficient facts to show an agreement. Shiny relies on the following evidence as proof of an agreement between defendants and Perkins to induce plaintiffs to provide funds: (1) the attorney-client relationship between defendants and Perkins; (2) Perkins' criminal history, an injunctive order entered against him barring his participation in the sale of securities, revoked broker license for "dishonest dealings and for mishandling client funds," and multiple bankruptcy filings which included adverse claims by creditors; (3) Zeoli's statements that Perkins was a "good guy," the "deal was going to be lucrative," and the collateral to be

provided as security; (4) defendants' participation in the drafting of the transactional documents; and (5) the fact that Zeoli revealed to Tabibi that Perkins filed a bankruptcy in 2008 but did not mention the adverse claims against him in that proceeding. Even reviewing this evidence in the light most favorable to plaintiffs, we find that it does not permit a reasonable inference of an agreement between defendants and Perkins. The allegation that defendants were in an attorney-client relationship with Perkins and knew or should have known of Perkins' past record does not support a finding that defendants entered into an agreement with Perkins for an illicit purpose. See *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23 (1998) ("the mere characterization of a combination of acts as a conspiracy is insufficient."). We further note that the complaint itself states that Zeoli had disclosed to defendants Perkins' 2008 bankruptcy proceeding, which placed them on notice. As such, Shiny's claim of civil conspiracy was properly dismissed.

¶ 105   With respect to its legal malpractice claim, Shiny argue that attorneys owe their clients a fiduciary duty of "fidelity, honesty, and good faith" and that its "legal malpractice action is based upon Zeoli's breach of his fiduciary duties rather than on any contractual breach." Shiny points out that the complaint provides "nineteen instances where the [d]efendants' breached their fiduciary duties arising from their attorney-client relationship." The complaint identifies these instances as "negligent acts." Most of these acts, however, pertain to defendants alleged involvement in facilitating the sale of securities in violation of the securities law and injunctive orders. Because we have found that the transaction at issue does not constitute a security, we may disregard such allegations. The remaining allegations pertain to (1) defendants' failure to investigate and disclose Perkins' multiple bankruptcies, including his 2008 bankruptcy so as to disclose any adverse claims in that proceeding, (2) failure to conduct a "cursory and basic interest

search on Perkins which would have disclosed his criminal arrests [and disciplinary actions]," (3) misrepresenting "the competency, background and business ethics of Perkins, (4) "overstating the equity of the property subject to the junior mortgage, (5) failing to provide sufficient factual basis regarding conflicts of interest in the waiver letter, and (6) failing to recuse from the transaction and failing to insist on separate legal representation and instead, representing clients on both sides of the transaction.

¶ 106    We note that in its opening brief, Shiny states, without more, the general proposition that attorneys owe their clients a fiduciary duty of "fidelity, honesty, and good faith" and that the waiver letter "cannot vitiate the [d]efendants' fiduciary duties to the plaintiffs." Shiny, however, fails to set forth the elements of a cause of action for breach of fiduciary duty or legal malpractice. Although Shiny alleged in its complaint that defendants committed several "negligent acts," Shiny fails to provide analysis as to how defendants were unfaithful, were dishonest, and acted in bad faith. "While it can be argued that all breaches of fiduciary duty on the part of an attorney amount to legal malpractice, we are unwilling to concede that all negligence on the part of an attorney in the rendition of legal services rises to the level of a breach of fiduciary duty." See *Metrick v. Chatz*, 266 Ill. App. 3d 649, 656 (1994). In addition, Shiny fails to provide a cohesive legal argument or a reasoned basis for its argument with citation to authorities that an engagement letter cannot be limited to the drafting of documents or that such letter here would "vitiate implied fiduciary duties." Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that an appellant's brief must contain contentions and the reasons therefor, with citation to the authorities upon which the appellant relies. Because Shiny failed to comply with Rule 341(h)(7), we find that it has forfeited this argument. See *In re Marriage of Petrik,* 2012 IL App (2d) 110495, ¶ 38 ("The appellate court is not a depository in which the appellant may dump the burden of argument and research."); *Palm*

*v. 2800 Lake Shore Drive Condominium Ass'n*, 401 Ill. App. 3d 868, 881-82 (2010) ("Contentions supported by some argument but by absolutely no authority do not meet the requirements of Supreme Court Rule 341(h)(7))."

¶ 107 Lastly, we address Shiny's contention that Rule 1.8(h)(1) of the Illinois Rules of Professional Conduct bars defendants "from using the [waiver letter] as a sword to limit their liability to the [p]laintiffs." Rule 1.8(h)(1) provides that "[a] lawyer shall not *** make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement." Ill. S. Ct. R. 1.8(h)(1) (eff. Jan. 1, 2010). However, as defendants note, the waiver letter does not curtail Shiny's claims for malpractice but instead provides for an agreed scope of work during a joint representation, which is permissible under Rule 1.2(c) of the Illinois Rules of Professional Conduct. Ill. S. Ct. R. 1.2(c) (stating that a lawyer may limit the objectives of the representation if the client consents after disclosure). Therefore, we find that the circuit court did not err in dismissing Shiny's legal malpractice claim.

¶ 108                              III. CONCLUSION

¶ 109   For the reasons stated, we affirm the judgment of the circuit court.

¶ 110   Affirmed.